# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

QUAD/GRAPHICS, INC.,

        Plaintiff,

   v.

ONE2ONE COMMUNICATIONS, LLC,
and BRUCE HEVERLY,

        Defendants, Counterclaimants,
        Third Party Plaintiffs,

   v.                            Case No.  09-CV-99

OPENFIRST, LLC, ROBERT KRAFT,
RICHARD ZAGORSKI, CHARLES OLSZEWSKI,
SCOTT KOSSORIS, and JAMES NASH,

        Third Party Defendants.

   and

SENTRY INSURANCE A MUTUAL COMPANY,

        Intervenor.

## ORDER

On September 1, 2010, plaintiff Quad/Graphics, Inc. ("Quad") and third-party

defendant Openfirst, LLC ("Openfirst") filed a Motion for Partial Summary Judgment

(Docket #58).  In addition to responsive briefing, on October 4, 2010, defendants and

third-party plaintiffs One2One Communications, LLC ("One2One") and Bruce

Heverly ("Heverly") filed a Motion for Order Pursuant to Rule 56(f) (Docket #67).[1]

---

[1]The text of Federal Rule of Civil Procedure 56 changed as of December 1, 2010, however the substance of the rule to which defendants appeal remains intact, now under Rule 56(d).  The court references Rule 56(d) from this point on.

That motion requests leave to conduct additional discovery and make additional submissions in response to Quad's and Openfirst's motion.[2] Quad's and Openfirst's motion asks for judgment in their favor and dismissal of a number of defendants' damage claims.

## BACKGROUND

Generally, this dispute arises from a business relationship between One2One and Openfirst that began around 2001 or 2002. Openfirst provided billing statement services for companies in the telecommunications industry. One2One procured, in some form, customers for billing statement services and Openfirst generally provided the services. The parties dispute the legal nature of the relationship, but, in any event, the relationship quickly deteriorated when Openfirst learned One2One was directing business from some customers to another provider. Heverly is essentially the principal of One2One.[3] Quad, in 2006, acquired a majority ownership interest in Openfirst and now stands as the plaintiff by the assignment of claims from Openfirst.[4] At issue here are counterclaims asserted by One2One against Quad and a third-party complaint by One2One against Openfirst. One2One has claimed a

---

[2]Subsequently, One2One and Heverly also filed a Motion to Compel (Docket #81), which somewhat overlapped their Rule 56(d) motion. The court disposed of that motion at hearing on March 9, 2011. (Docket #105). As a result, discovery is currently ongoing. Where it is relevant, the court references that disposition, but will refrain from otherwise laying out the full factual background.

[3]As such, when referring to both One2One and Heverly in terms of arguments presented, the court will refer to both simply as "One2One."

[4]As with One2One, the court will refer to both Quad and Openfirst simply as "Quad" when discussing their arguments.

number of different types of damage. But because most facts are disputed, the court lays out the relevant facts individually within the context of each issue discussed below.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine issue of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983). However, where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," there is no genuine dispute as to any material fact because a complete failure of proof "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. at 322-23.

Under Rule 56(d), a district court may allow additional discovery where the party opposing a motion for summary judgment shows by affidavit or declaration that it cannot present facts "essential" to justify opposition. Fed. R. Civ. P. 56(d). This may be done by deferring consideration of the motion, denying it, allowing further time for discovery, or any other appropriate order. Fed. R. Civ. P. 56(d)(1)-(3). By the language of the rule, such a grant is discretionary and, further, it is implicitly unnecessary where the motion for summary judgment fails.[5]

## ANALYSIS

One2One has asserted seven claims against Quad and the third-party defendants: slander *per se*; conspiracy to injure trade or business; breach of contract; conversion; tortious interference with contractual rights; tortious interference with prospective contractual relations and business advantage; and unjust enrichment. Among the various allegations, One2One claims a number of distinct damages: expedited costs of leasing equipment; sales channel development delays; lost business from cancelled marketing campaigns; an increased rate charged by a contractual partner, Data Services Solutions ("DSS"), for billing statement services; lower-than-anticipated pricing terms and subsequent contractual changes with another partner, Bright House Networks; and legal and expert witness

---

[5]Clearly, further discovery is not "essential" where the motion fails despite additional discovery.

fees. Each of One2One's claims involve an element of causation.[6] Quad's motion focuses only on the causation element of the identified damages and seeks a judgment that One2One is not entitled to those damages for lack of causation, regardless of whether the claimed conduct occurred. Because the summary judgment and Rule 56(d) motions are intertwined, the court deals with both as to each claim. Ultimately, the court will grant in part and deny in part both motions.

## I. EXPEDITED LEASING COSTS, SALES CHANNEL DEVELOPMENT DELAYS, AND CANCELED MARKETING CAMPAIGNS

Quad's first argument urges the court to grant it judgment dismissing One2One's claims for damages related to expedited costs of leasing equipment, "sales channel development delays," and two canceled marketing campaigns. However, the court finds that genuine disputes of material fact remain and will deny the motion as to this issue.

As previously mentioned, One2One and Quad dispute a number of the facts in this case. The analysis of facts relevant to disposing of the motions follows, but in order to provide some background, the court begins by summarizing the disputes.

---

[6] *See Radue v. Dill*, 246 N.W.2d 507, 511 (Wis. 1976) (cause of action for conspiracy to injure trade or business accrues to person to whom damage is caused); *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.*, 2005 WI App 217, ¶ 14, 287 Wis. 2d 560, 706 N.W.2d 667 (tortious interference includes the element of "a causal connection" between interference and damages); *In re Guardianship of Kordecki*, 290 N.W.2d 693, 696 (Wis. 1980) (unjust enrichment implies a promise to repay where one is enriched "at the expense of another"); *Dalton v. Meister*, 188 N.W.2d 494, 497 (Wis. 1971) (slander *per se* presumes harm which "normally results from the defamation"); *Metro. Sav. & Loan Assn. v. Zeulke's, Inc.*, 175 N.W.2d 634, 639 (Wis. 1970) (purpose of conversion rule of recovering value of property is "to compensate . . . for the loss sustained because his property was taken"); *White v. Benkowski*, 155 N.W. 2d 74, 77 (Wis. 1967) (breach of contract damages generally limited to compensation for loss sustained by breach).

One2One asserts that sometime after it and Openfirst began working together, it became apparent that Openfirst did not have certain equipment and expertise necessary to perform the work procured by One2One. As such, the two entered into an agreement wherein they would share the costs related to those necessary expenses over the course of five-years. The cost-sharing was allegedly only applied to certain accounts. In essence, One2One claims that it provided financial support that would allow Openfirst to perform the work procured by One2One, and that the cost-sharing agreement implementing that support required a five-year amortization of costs. In 2007, the relationship, wherein Openfirst provided services for customers procured by One2One, was terminated – prematurely according to One2One. As a result of the terminated relationship, One2One suffered three categories of damage that are undisputed for purposes of Quad's motion: expedited leasing costs, sales channel development delays, and cancelled marketing campaigns. (Defs.' Resp. to Statement of Fact [hereinafter SOF] ¶¶ 15, 20, 23) (Docket #63).[7] The leasing costs relate to One2One's leasing of eight new machines to perform required work after Openfirst stopped performing that work. (Defs.' Resp. to SOF ¶¶ 15, 17-18). The sales channel development delays refer to consequential damages arising from "cash flow constraints" as a result of shutting down marketing and new business development in order to secure existing customers. (Defs.' Resp. to SOF ¶¶ 20-21). The cancelled marketing campaigns

---

[7]Though some assertions are "disputed," where the dispute is irrelevant or otherwise, the court cites to One2One's response to Quad's statement of fact regardless.

involved work to allegedly be done by One2One, but which could no longer be done after termination of One2One and Openfirst's working relationship.[8] (Defs.' Resp. to SOF ¶¶ 24-25).

Quad refers to these three categories of damages as the "termination damages" in that they resulted from the fact that the manufacturing and service relationship between Openfirst and One2One was terminated. Quad does not attack One2One's claims directly, but rather asserts that they cannot recover the termination damages because they have failed to produce any evidence sufficient to show the existence of the required causal link between Quad's conduct and One2One's alleged damages. Quad argues that the damages in question were caused only by the fact of "termination" – that is, the ending of the manufacturing and service relationship. In turn, Quad argues that the fact of termination has nothing to do with any of the claimed conduct and, therefore, One2One has failed to show a causal connection between any alleged claim and the "termination" damages.[9] In support, Quad points to Heverly's supposed concession that the relationship between Openfirst and One2One was terminable at will. (Heverly Dep. Vol. II 295:25-296:12) (Docket #61-2).

---

[8]As with so many other facts in this case, the actual reason that the marketing campaigns were cancelled is hotly disputed.

[9]The substance of Quad's motion points to its real argument: that Quad did not breach any legal or contractual obligation and thus the defendants have suffered no injury from which damages may flow. *See* Restatement (Second) of Torts § 902, comment a; *see also* Restatement (Second) of Contracts § 347 (*injured* party entitled to damages).

To begin, the court finds material the question of fact concerning whether there existed an agreement between Openfirst and One2One. Further, the court also finds material the question of fact concerning whether, assuming such an agreement, it was terminable at will. If there was no agreement, there can be no breach and thus no damage from terminating the relationship. Additionally, even if there was an agreement, if the agreement provided that the relationship was terminable at will there could similarly be no breach and thus no damage from terminating the relationship. Because the three forms of "termination" damages may be found to result from any contractual breach, those two facts are material in that their existence may change the legal outcome. Next, per the following discussion, the court finds that there remains a genuine dispute as to both material facts, thus summary judgment is inappropriate on this issue.

A.    Whether an Agreement Existed

As to the existence of an agreement, evidence offered through Heverly's deposition testimony, as well as his declaration and attached exhibit in opposition to the summary judgment motion, establish a genuine dispute. During his deposition, Heverly responded as follows:

> Q.    The parties never get to the point where they agree on setting up a contract that says "this is how our relationship will be structured. We're good with these terms and we'll sign off on it"?
>
> A.    That's not a correct statement.
>
> Q.    They didn't agree?

> A. We operated for years under an agreement as to how certain things would take place.
>
> It is true that that contract was never memorialized, but there were – there was an agreement in place as to how we did certain things. They just weren't necessarily memorialized in that contract.

(*Id.* at 336:20-337:7). Further, in his declaration, Heverly states that there existed an understanding regarding cost-sharing and recovery that would be amortized over a five-year period. (Heverly Decl. ¶ 23) (Docket #64). This statement is supported by email correspondence and an attached draft agreement from an Openfirst employee. (Heverly Decl. Ex. E) (Docket #64-1).

Quad complains that this assertion should be stricken from Heverly's declaration because it is not based on personal knowledge.[10] That argument fails. A declaration in support or opposition of a motion for summary judgment must be made on personal knowledge. Fed. R. Civ. P. 56(c)(4). Quad points to Heverly's admission that Openfirst and One2One never signed an agreement, and that he does not know whether the parties ever operated under the agreement. However, Quad cites to a portion of Heverly's deposition which it has failed to attach as an

---

[10]Quad asserts that Heverly's declaration as to the fact that the alleged agreement was not terminable at will should be stricken under the sham affidavit rule, whereas his declaration as to the existence of the alleged agreement as a whole, as well as its terminability, should be stricken for lack of personal knowledge. The court deals with the issue of striking testimony as to each fact separately.

exhibit.[11]  Thus, on that ground alone, Quad has failed to establish that Heverly's testimony should be stricken because Quad itself has failed to properly support its argument.  But even were the proper deposition pages before the court, and such citation was accurate, Quad's argument would still fail.  An admission that there is no signed document does not mean an agreement did not exist.  Further, Heverly's alleged response to whether the parties operated under the agreement was that he "would have to defer to Rick and Mike to give that answer exactly.  It was Rick's job to oversee this kind of detail."  (Pls.' Reply Br. in Supp. 6) (Docket #71).  The deposition from which the alleged statements arise occurred on June 8, 2010.  (Heverly Dep. Vol. I, at 1).  In comparison, Heverly submitted his declaration on October 4, 2010.  Nothing in Heverly's initial deposition testimony forecloses the possibility of him gaining personal knowledge in the nearly four months between the deposition and declaration as to whether the parties operated under the agreement.  Heverly did not testify that he both did not know, and would also never be able to know.  Instead, Heverly testified that he would have to defer to others.  The subsequent declaration does not indicate that he did not confer with others, nor is it otherwise contradictory.  In fact, Heverly's attachment of the alleged cost-sharing agreement and financial reconciliation form to his declaration (Heverly Decl. Ex. E

_____

[11]Quad cites to pages 167 and 168 of the Deposition of Bruce Heverly Volume I.  While portions of that deposition have indeed been submitted with the declaration of attorney Michael Huitink (Heverly Dep. Vol. I) (Docket #61-1), the pages submitted range from 162 to 165 and then jump from 174 to 177.  This is a situation that illustrates why, not only is it helpful to the court for parties to submit full copies of depositions and other transcripts, but it is also helpful to the parties in avoiding mistakes such as this.

& F), and his explanation of how the reconciliation form illustrates the application of the cost-sharing agreement (Heverly Decl. ¶¶ 20-22), substantiate that Heverly in fact has sufficient personal knowledge. As such, the court will refrain from striking any of Heverly's declaration for lack of personal knowledge.

In any event, to the extent that Quad argues that One2One has not sufficiently shown that the parties operated under an agreement, Heverly's earlier deposition testimony stated that the parties "operated for years under an agreement as to how certain things would take place." (Dep. of Bruce Heverly Vol. II 337:1-337:2). Thus, based on the opposition materials submitted by One2One, the court finds a genuine dispute remains concerning whether an agreement between the parties existed.

### B.    Whether Any Agreement Was Terminable at Will

As to whether any agreement was terminable at will, Heverly's supposed concession, read in the context of the deposition, is not sufficient to establish the lack of a genuine dispute. At his deposition, Heverly responded as follows:

> Q.    Are you aware of any contract between Openfirst and One2One, formerly known as whatever it was formerly known as, establishing a set term in terms of years for this relationship?
>
> A.    No.
>
> Q.    Your contention is, then, that this relationship between the two companies could have been terminated at any time?
>
> A.    No.
>
> MR. BEYEL: You're asking if that is his contention?

MR. HUITINK: Right.

A.    (Continuing) Could you – I'm not sure I understand the question.

Q.    I'll try to put it in more common English.  There is no written signed agreement establishing a definite duration for this relationship, however we classify it.  Right?  Is that correct?

A.    Yes.

Q.    What I'm trying to figure out is it your contention, then, that either party could give notice and terminate this relationship at any point?  Is that your understanding?

A.    As far as a written contract?

Q.    Yes.  I'm just asking for your contention, your understanding.  Did you have an understanding that either party could terminate this relationship at any time?

A.    That's a good question.

Q.    Is the answer you don't know?

A.    I would say technically, yes.

(Heverly Dep. Vol. II 295:4-296:12).  First, Heverly's response may be reasonably read to indicate his agreement only with the fact that there was no *written* contractual provision preventing termination at will of the relationship.  Without further factual elaboration, the court cannot say there is no dispute.  Second, Heverly is not a lawyer.  In the face of Heverly's deposition testimony, as well as other evidence of a five-year agreement discussed above, his statement, taken as Quad wishes the court to take it, is a legal conclusion that he is not qualified to make.  Heverly's

statement is certainly relevant evidence that may assist the fact-finder in determining whether the relationship was terminable at will, but it does not remove the issue from the realm of a genuine dispute.

Heverly also asserts in his declaration that the alleged agreement was not terminable during the five-year period. (Heverly Decl. ¶ 23). Quad argues for striking this statement because it runs afoul of the "sham affidavit" rule, but the court disagrees. Under the sham affidavit rule, a party may not thwart summary judgment by creating a "sham" issue through an affidavit that contradicts a prior deposition. *Bank of Ill. v Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). Because the court finds the evidence outside of this statement independently sufficient to raise a genuine dispute, it is unnecessary to resolve Quad's objection for purposes of the summary judgment motion.[12] However, Quad's objection would fail regardless. Heverly's assertion does not directly contradict his deposition testimony because, as noted above, his deposition does not foreclose the possibility that the alleged agreement was not terminable at will. As such, the court will refrain from striking the statement.

Thus, because the issues of whether there was an agreement and whether it was terminable at will are material, and the evidence offered shows that a genuine dispute remains, summary judgment is not appropriate on the question of whether

---

[12]The additional evidence provided regarding the cost-sharing agreement supports an inference that parties who have agreed to share costs over the course of five years are expected to comply with the agreement during that time period.

defendants are entitled to recover damages related to expedited costs of leasing equipment, sales channel development delays, and the canceled marketing campaigns. Further, because the court will deny summary judgment as to this issue, an order under Rule 56(d) is unnecessary and the court will deny One2One's motion as moot regarding discovery on this issue as well.

## II.  DSS DAMAGES

Quad's second argument asserts that One2One's claim for damages flowing from increased billing rates by their partner, DSS, has no basis and must be dismissed. Quad is correct, and additional discovery would not change the outcome. The parties do not dispute that One2One had a "manufacturing" alliance with DSS in which DSS provided manufacturing services to One2One for an agreed price. (Defs.' Resp. to SOF ¶ 43). The contract allowed DSS to increase prices for its services and, in June 2007, DSS did so. (Defs.' Resp. to SOF ¶¶ 44-45). The reason for DSS choosing to raise its rates, however, is disputed. But, as will be discussed, that dispute is immaterial.

Tortious interference with a contractual relationship contains five elements: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 44, 294 Wis. 2d 274, 304, 717

N.W.2d 781.  Further, tortious interference may occur not only where the interfering party causes breach of a contract, but also where the offending conduct causes performance to be "more expensive or onerous."  *Magnum Radio, Inc. v. Brieske*, 577 N.W.2d 377, 379 (Wis. App. 1998).

These two methods of interference are distinct, however, and result from adherence to the Restatement (Second) of Torts.  *See id.* at 136-40.  In the first cause of action, the tortfeasor interferes with a contract by causing a third party not to perform the contract between the third party and the plaintiff.  *Id.* at 136; Restatement (Second) of Torts § 766.  In the other, the tortfeasor interferes with a contract by preventing, or increasing the cost or burden of *the plaintiff's own performance* of the contract.  577 N.W.2d at 137-40; Restatement (Second) of Torts § 766A.  Comment to the Restatement explains that § 766A "is concerned only with the actor's intentional interference with the plaintiff's performance of his own contract. . . .  It is to be contrasted with § 766, which states the rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff."  Restatement (Second) of Torts § 766A cmt. a.

One2One argues that Quad's actions destabilized the relationship with DSS, causing DSS to increase the rates charged to One2One, thereby causing the contract to become more expensive.  However, in his deposition, Heverly admitted that DSS retained the ability to increase rates charged to One2One under the terms of their agreement.  (Heverly Dep. Vol. II 378:17-20).  In this case, as DSS had the

right to increase rates, the benefit of the bargain never included a cap on the price charged by DSS. Thus, Quad could not have caused DSS to breach the agreement. Further, though DSS's raised rates did literally increase the cost of the contract for One2One, it did not make One2One's *performance* more expensive. One2One's only performance obligation was to tender payment at the contractual rate for services provided. Quad's alleged actions in no way increased the cost of One2One's tender of the payment due. Therefore, as a matter of law, One2One cannot recover the increased cost of DSS's services as a result of any alleged communications with Quad. Quad is entitled to judgment as a matter of law on this issue.

Similarly, the court will deny One2One's Rule 56(d) motion as to this issue. The only potential factual disputes raised have to do with whether Quad in fact caused DSS to raise its rate. But, in light of the preceding discussion, that fact is not material to the issue and thus further discovery and the fruits of such could not result in the court coming to a different outcome. The only material fact is whether DSS had a contractual right to raise its rate, and Heverly admitted there was such a right. Thus, additional discovery on this issue is unnecessary.

## III.    BRIGHT HOUSE DAMAGES

Quad also argues that One2One cannot recover the increase in cost between a prospective contract with partner Bright House and the ultimate contract. In light of the fact that discovery remains ongoing after One2One's motion to compel, the

court concludes that a ruling on the Bright House damages is premature and will deny the motion without prejudice on this issue. By January 2007, One2One and Bright House had primarily worked out an agreement over the terms of a new contract between the two. (Defs.' Resp. to SOF ¶ 34). There was no signed contract at that time, however. (Defs.' Resp. to SOF ¶ 35). Before a final contract was signed, Openfirst, after termination of its relationship with One2One, made a lower bid to Bright House for the same services. (*See* Defs.' Resp. to SOF ¶¶ 36-38). One2One specifically seeks the difference in value between the originally contemplated contract and the ultimate contract entered. (Defs.' Resp. to SOF ¶ 41). What is heavily in dispute is the content and character of communications made by Openfirst to Bright House in making its lower bid. (Defs.' Resp. to SOF ¶ 40).

One2One's argument for recovery rests again on tortious interference. Quad begins by implicitly arguing that One2One's claim is not actionable under Wisconsin law because it is a "mere expectation" and that instead, a "bargained-for right to expect [the customer] relations to continue" is required. (Pls.' Br. in Supp. 17) (Docket #62) (alteration in original). Unfortunately, Quad misreads the cited case and misstates the law. Quad turns to an Eastern District of Wisconsin case, applying Wisconsin law, for this proposition. *Shank v. William R. Hague, Inc.*, 16 F. Supp. 2d 1038, 1045 (E.D. Wis. 1998). In *Shank*, at the outset, the court noted that the plaintiffs' claim for interference with an existing relationship failed for lack of a

contract. 16 F. Supp. 2d at 1043. Next, the court rejected plaintiffs' claim of interference with a prospective contract because the plaintiffs had failed to show any prospective contract. *Id.* at 1043-44. Finally, the plaintiff argued that it had sufficient "economic relations" (as opposed to contractual relations), either current or prospective, so as to fall under tortious interference. *Id.* at 1044. The district court rejected this argument, explaining the lack of support in each of the plaintiffs' cited cases. *Id.* at 1044-45. In refuting the plaintiffs' argument, the court concluded by stating that the plaintiffs had not proved a "bargained-for right" to expect the economic relations to continue, nor did they prove the relations were "sufficiently certain, concrete and definite," or that the relations "had the potential to ripen into a full contractual relationship." *Id.* at 1045 (citing E.D. Wis. and 9th Cir.) (internal quotation and citation omitted). Essentially, the court declined to extend tortious interference to economic relations without showing the relations were at least somewhat analogous to a current or prospective contract. Thus, it is clear that at no time did the court require that a claim for interference with a prospective contract be based upon a "bargained-for right."[13]

This conclusion is bolstered by Wisconsin case law that permits tort liability for interference with a contract that is terminable at will. *Mackenzie v. Miller Brewing*

---

[13]This would make little sense in any event. A bargained-for right is essentially a contract, and such a holding would thus require that an action for interference with a yet-to-be entered contract be based on an existing contract. If this were the case, a cause of action in tort for interference with a prospective contract would be unnecessary as the action could be brought for interference with the existing underlying contract.

*Co.*, 2000 WI App 48, ¶ 63, 234 Wis. 2d 1, 46, 608 N.W2d 331. A contract terminable at will contains no bargained-for expectation that it will continue, yet it may still be protected from interference under tort law. Thus, One2One's claim cannot be barred for lack of a bargained-for right. Instead, it is sufficient if it shows a prospective contract. This it has done, as Quad does not dispute that One2One had a prospective contract with Bright House. (Pls.' SOF ¶¶ 33-34).[14]

Quad next argues that recovery is precluded because it held the privilege of competition, barring liability for tortious interference. However, the court finds that defendants are entitled to additional discovery in order to present facts to justify their opposition under Rule 56(d). Generally, competition is not a tort, and thus courts "have ruled that while competition is not a defense to a charge of interfering with an existing contract . . . it is a defense to a charge of interfering with prospective contractual relations, provided it is fair competition." *Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941, 947 (7th Cir. 1986). Under the Restatement,

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor . . . does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.

---

[14]Though Quad does not directly argue this, the language of the statement of fact is slightly ambiguous in that it could be read to state only that defendants allege a prospective contract, as opposed to admitting that there was a prospective contract. Even in that event, defendants have made a sufficient showing to place that question into genuine dispute. (*See* Heverly Decl. ¶ 48 & Ex. W).

Restatement (Second) of Torts § 768(1). Though the only apparent Wisconsin case to touch the issue of whether competition is privileged did not decide it, it did cite to both a Western District of Wisconsin case and the Restatement of Torts to explain the proposition. *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.*, 2005 WI App 217, ¶ 29, 287 Wis.2d 560, 578, 706 N.W.2d 667. Further, as noted earlier, Wisconsin courts have stated that the tort of interference with a contract or prospective contract is adopted from the Restatement. Thus, the court is convinced that competition is a defense to tortious interference under Wisconsin law.

Defendants allege two possible ways in which Quad tortiously interfered with the prospectively higher-priced Bright House contract: through inducing Openfirst to prematurely terminate the cost-sharing agreement mentioned above;[15] or through misrepresentations made to Bright House about One2One. Quad argues that Heverly admitted in his deposition that the reduced contract price with Bright House was solely a product of Quad making a lower offer. The deposition, however, is not so clear. In it, Heverly responded as follows:

---

[15]As to this first ground, One2One argues it only in the alternative, in the event that Quad disclaims assuming the contractual rights and duties under any alleged cost-sharing agreement between One2One and Openfirst. (Defs.' Br. in Opp. 16-18, 21-22) (Docket #62). In its reply brief, Quad does not directly address the argument. (Pl.'s Reply Br. 13-14). Thus, while not necessarily an admission, the court sees no reason to address the issue at this stage. Further, even were the court to deal with the issue, any tortious inducement of contractual breach by Quad could only be a cause of the Bright House damages if Openfirst's conduct was itself a cause. Thus, the issue is predicated on the misrepresentation claim more fully discussed in this section and the result would be the same.

Q.    . . . The Bright House contract pricing reductions resulted in over a million dollars.  What does that relate to?

A.    That's [sic] relates to the campaign that Quad and Openfirst went on when we had agreed to terms with Bright House Networks for a new contract, and the terms, as Robert Kraft noted in his documents that he turned over, he was told we have agreed to the terms.  They're the same terms as they were before, and we were ready to sign the contract, and there's notes from Nancy Friedmann.

Subsequent to that a letter was sent to Bright House Networks to their executive staff saying, in essence, what we coined after we were told the name of it, the blow-up machine, laid out exactly what the blow-up machine was, and part of that was getting rid of it and taking the margin that I would have received and give it back to the client, so we were squeezed and we didn't execute the agreement that they said they were ready to execute.

We were forced into a new environment, a new contract.
. . .

Q.    Then there is a communication by Quad or Openfirst to Bright House offering a lower price?

A.    There were a number of communications.  It was a culmination of all of the communications, as well as that letter documented exactly what Quad was trying to do in the relationship.
. . .

Q.    I want to stick to the question here.  The question simply is, the price reduction that you're claiming was forced upon you by Bright House was a result of Quad or Openfirst coming in and offering a lower price.  Correct?

A.    Yes.

(Dep. of Bruce Heverly Vol. II 371:3-373:21). In reading the deposition response in the light most favorable to defendants, Heverly's response, that there were multiple communications between Quad and Bright House, does not foreclose the possibility that some of those communications also contained wrongful means. One2One, however, does not provide further evidence sufficient for this court to find that a reasonable jury could return a verdict in its favor. But, in the Rule 56(d) motion and accompanying declaration, One2One has asserted that Quad did not perform certain electronic searches as requested, and thus there remains the possibility that sufficient evidence may exist. The issue of further discovery was recently dealt with in a hearing before this court on One2One's Motion to Compel (Docket #105). Discovery remains ongoing as of this point. Thus, it is most appropriate to grant the Rule 56(d) motion by denying Quad's motion on this issue until discovery is complete.

Finally, Quad argues that, regardless of wrongfulness, One2One has simply failed to show any causal link between Quad's alleged conduct and Bright House's decision not to enter into the more expensive original agreement. Quad argues that One2One's only relevant showing is Heverly's declaration that "[b]ut for the attacks upon my integrity, and that of my company," Bright House would have entered into the higher-priced contract with One2One. (Heverly Decl. ¶ 47). Quad then asserts that this conclusion is not supported by any evidence because Heverly has no basis for knowledge as to Bright House's intention and One2One has offered no direct

evidence from Bright House in the form of documents or testimony to support the conclusion. However, given One2One's offer of the email from Bright House to Heverly regarding Bright House's willingness to move forward on the more favorable contract (Heverly Decl. ¶ 48 & Ex. W), a reasonable jury could infer an intent to enter the contract, and infer that Quad's conduct caused Bright House to abandon that intent. Of course, such a finding remains subject to the question of whether Quad's conduct was in fact privileged competition. If it was, a dispute as to causation would not prevent summary judgment because the claim would fall on the ground of privileged competition.

Thus, the court will refrain from ruling on the issue until the currently ongoing discovery is completed. On the basis of the flexibility granted under Rule 56(d), the court will deny Quad's motion on this issue without prejudice, subject to renewal upon the completion of the continuing discovery contemplated in the March 9, 2011 hearing on One2One's motion to compel.

## IV. LEGAL AND EXPERT FEES

Last, Quad argues that One2One may not recover certain legal and expert witness fees because of the "American Rule" governing award of attorney fees. Quad is partially correct, leading the court to grant in part and deny in part the motion on this issue. Under the American Rule, attorney fees incurred during litigation are not typically recoverable. *F.D. Rich. Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 126 (1974). However, attorney fees *are* recoverable

when incurred in third-party litigation caused by the party from whom fees are sought. *In re Guardianship & Protective Placement of Evelyn O.*, 571 N.W.2d 700, 702 (Wis. App. 1997). This third-party litigation exception "permits the award of attorney fees if the wrongful acts of a defendant have involved a plaintiff in litigation with others, or placed him or her in such relation with others as to make it necessary for the plaintiff to incur expenses to protect his or her interest." *Bank One v. Koch*, 2002 WI App 176, ¶ 14, 256 Wis. 2d 618, 649 N.W.2d 339. This rule makes logical sense, recognizing that the American Rule is constrained to fees arising within the confines of the case in which the award is sought.[16]

There are essentially two classes of fees at issue here. One set of fees are those incurred in direct pursuit of the claims at issue. For these, One2One and Heverly argue that, while they are not directly recoverable under the American Rule, a jury should be allowed to consider them for purposes of calculating any possible punitive damages. The second class of fees are those incurred by Bright House Networks and Insight Communications resulting from their own investigations concerning statements made by Quad about One2One. These are actually monetary payments made by One2One to its partners in order to reimburse them for those partners' own fees. In essence, these fees have not been incurred in this

---

[16]The policy behind the American Rule supports this line of logic as well. As the Supreme Court noted, the American Rule is grounded in the idea that litigation is uncertain and it would be unfair to penalize parties for merely defending or prosecuting a suit. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967). Moreover, the English rule might unjustly discourage the poor from seeking to vindicate their rights in court. *Id.* The content of those policy considerations do not speak to situations wherein a party seeks recovery of fees as a form of damage flowing from a wrong, rather than a prize for prevailing in court.

litigation, but are rather allegedly the consequence of One2One having to mollify its partners after Quad's actions. After considering that delineation, the application of the rule becomes apparent. One2One is not entitled to recover fees directly incurred during this litigation. However, Quad makes no argument, nor does the court find any reason without further argument, that One2One should not be allowed to introduce evidence of the fees for consideration by the jury in any punitive award. In any event, such an issue is more properly the subject of an evidentiary ruling when the time is appropriate. As to the fees incurred outside of this litigation by One2One's third-party partners, later reimbursed, those are properly damages, and not attorney fees within the meaning of the American Rule. Thus, those costs are potentially recoverable.[17] As such, the court will grant Quad's motion to the extent of barring One2One from directly recovering fees incurred in this litigation and otherwise deny the balance.

## V. CONCLUSION

In sum, the court will grant in part and deny in part both motions. Because there remains a genuine dispute as to the existence of an agreement as well as whether it was terminable at will, summary judgment is not appropriate as to the "termination" damages, that is, the expedited leasing costs, sales channel development delays, and canceled marketing campaigns. As to the DSS damages, however, DSS had the right to increase the price it charged and thus One2One's

---

[17]Though the court makes no further finding beyond the non-applicability of the American Rule.

claim fails as a matter of law. Moreover, no further discovery could change the disposition. Regarding the Bright House damages, further discovery may raise a genuine dispute, and thus the court will grant One2One's Rule 56(d) motion on this point by denying Quad's motion for judgment on this issue until discovery is concluded. Finally, One2One is not entitled to directly recover attorney fees incurred in the instant action, and the court grants Quad's motion to that extent, but any issue as to presenting that evidence to the jury is more properly dealt with in an evidentiary ruling. Further, to the extent One2One claims damages for having reimbursed third parties for their legal expenses due to Quad's conduct, those damages are not precluded by the American Rule. Thus, the court will deny Quad's motion on that issue. Finally, except as otherwise noted above, the court will deny the remainder of One2One's 56(d) motion as moot.

Accordingly,

**IT IS ORDERED** that the plaintiff's Motion for Partial Summary Judgment (Docket #58) be and the same is hereby **GRANTED in part** and **DENIED in part**. Plaintiff's motion as to the expedited leasing costs, sales channel development delays, and canceled marketing campaigns is **denied**; plaintiff's motion as to the DSS damages is **granted**; plaintiff's motion as to the Bright House damages is **denied without prejudice**, subject to renewal upon completion of discovery; plaintiff's motion as to attorney fees is **granted** as to recovering fees directly incurred in this suit, and **denied** as to fees incurred by third parties; and

**IT IS FURTHER ORDERED** that the defendants' Motion for Order Pursuant to Rule 56(f) (Docket #67) be and the same is hereby **GRANTED in part** and **DENIED in part**. Defendants are entitled to further discovery regarding the Bright House damages, as reflected by the court's denial of summary judgment without prejudice on that issue.

Dated at Milwaukee, Wisconsin, this 25th day of March, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge