# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| QUAD/GRAPHICS, INC., | |
| Plaintiff, | |
| v. | Case No. 09-CV-99-JPS |
| ONE2ONE COMMUNICATIONS, LLC, and BRUCE HEVERLY | |
| Defendants-Counterclaimants and Third-Party Plaintiffs, | |
| v. | |
| OPENFIRST, LLC, ROBERT KRAFT, RICHARD ZAGORSKI, CHARLES OLSZEWSKI, SCOTT KOSSORIS, and JAMES NASH, | ORDER |
| Third-Party Defendants, | |
| and | |
| WESTCHESTER FIRE INSURANCE COMPANY, | |
| Intervenor. | |

On August 15, 2011, September 1, 2011, and September 14, 2011, the parties in this action collectively filed seven separate motions *in limine*. Plaintiff Quad/Graphics, Inc. ("Quad") and third-party defendant Openfirst, LLC ("Openfirst") filed a Motion to Exclude Expert Testimony of Daniel Gotter (Docket #133), a Motion to Exclude Evidence of Settlement Agreement and Escrow Agreements (Docket #140), a Motion to Exclude Defendants' Claim for Future Lost Profits for Sales Channel Development Delays (Docket #142), and a Motion to Exclude Defendants' Claim for Bright House Price

Reduction Damages (Docket #166). Defendants One2One Communications, LLC ("One2One") and Bruce Heverly ("Heverly") filed a Motion to Exclude Reasons for Termination of Nicholas Grimaldi (Docket #145) and a Motion to Preclude Testimony Regarding Contract Terms Differing from Complaint Allegations (Docket #148). Third-party defendants Robert Kraft, Richard Zagorski, Charles Olszewski, Scott Kossoris, and James Nash (collectively, "Management Group") filed a Motion to Exclude Testimony or Argument Regarding Defamatory Statements (Docket #137).

BACKGROUND

This case involves a business dispute between Quad, Heverly and One2One. Heverly is the principal owner of One2One. Openfirst is now a subsidiary of Quad. Originally, Heverly and One2One entered a business relationship with Openfirst, with the parties cooperating in the printing of direct mail and billing statements for clients such as cable companies and automobile manufacturers. Both sides dispute the legal relationship between the parties, but, at base, Heverly and One2One essentially procured customers and Openfirst performed the billing and statement processing. Quad originally brought suit against Heverly and One2One alleging breach of contract, tortious interference, breach of trust and confidence, violation of Wisconsin statute prohibiting deceptive or misleading statements for purpose of selling goods or service, and requested a declaratory judgment that it did not tortiously interfere with any rights of the defendants. Heverly and One2One counterclaimed for slander *per se*, violation of Wisconsin statute prohibiting willful and malicious injury to business, breach of contract, conversion, tortious interference, interference with prospective economic advantage, and unjust enrichment. Heverly and One2One also

Case 2:09-cv-00099-JPS   Filed 09/23/11   Page 2 of 28   Document 182

filed a third-party complaint against the Management Group[1] for the same alleged transgressions.

Quad and Openfirst, collectively, have filed four motions *in limine*, seeking exclusion of: a certified public accountant's ("CPA") expert testimony; all evidence relating to a settlement agreement and escrow agreements; the claim for lost profits due to "Sales Channel Development Delays"; and the claim for damages due to reduction of the value of a contract with Bright House. Heverly and One2One have filed two motions *in limine* seeking exclusion of any mention or evidence as to the reasons for terminating the employment of Nicholas Grimaldi, a former employee of Openfirst, as well as testimony regarding alleged contract terms which differ from, or are in addition to, those terms alleged in the complaint. Finally, the Management Group has filed one motion *in limine* seeking exclusion of testimony regarding the defamatory statements they allegedly made as well as any arguments or suggestions to the jury that commercial speech is *per se* slanderous or defamatory.

## DISCUSSION

Per the following discussion, the court will grant in part and deny in part Quad's motion to exclude the testimony of Daniel Gotter (Docket #133), and deny its motions to exclude the Settlement and Escrow Agreements, the claim for profits lost due to Sales Channel Development Delays, and the claim for Bright House contract pricing reductions (Docket #140, #142, #166). The court will grant Heverly and One2One's motion excluding testimony on the reasons for Nicholas Grimaldi's termination from Openfirst. (Docket

---

[1] The Management Group is referred to as such because they were managers at Openfirst during the events involved in this dispute.

Case 2:09-cv-00099-JPS   Filed 09/23/11   Page 3 of 28   Document 182

#145). However, the court will deny Heverly and One2One's motion seeking to bar testimony as to contract terms not in the complaint (Docket #148), as well as the Management Group's motion regarding testimony and argument as to defamatory statements (Docket #137).

I.      QUAD'S AND OPENFIRST'S MOTIONS

The court will grant in part and deny in part Quad's motion seeking to exclude the expert testimony of Daniel Gotter, CPA (Docket #133). His testimony regarding direct damages is admissible, but not as to lost profits or reputational damage. Gotter's testimony regarding direct damages is more than simply parroting conclusions provided by Heverly and One2One. However, his testimony on some lost profits is based on unreliable methodology, and on others is simply a bottom-line conclusion parroted from the plaintiffs. Further, Gotter's opinion on reputational damage is entirely speculative. However, the court will deny Quad's motion seeking to exclude evidence of the Settlement and Escrow Agreements (Docket #140) because the documents fall within the exception to barring admission of settlement communications and would not be confusing to a jury. A jury is likely to appreciate the concept of an indemnity agreement and the fact that it does not admit liability. The court will also deny Quad's motion to exclude Heverly and One2One's claim for lost profits due to Sales Channel Development Delays (Docket #142) because the Chief Operating Officer's testimony has a sufficient foundation of personal knowledge given his position and involvement in sales. Finally, the court will deny the motion seeking exclusion of the claim for damages from the allegedly lower-priced contract with Bright House (Docket #166) because it is in improper dispositive motion.

A.     Motion to Exclude Testimony of Daniel Gotter, CPA

Quad's first motion *in limine* (Docket #133) asks the court to exclude the testimony of Heverly and One2One's expert witness Daniel Gotter ("Gotter"), a CPA. Quad argues the testimony is inadmissible under Federal Rule of Evidence 702, as well as Rule 403. There are three categories of damages Gotter would likely testify as to: direct damages, lost profits, and reputational damage. The court will grant Quad's motion with respect to barring his opinion on lost profits and reputational damage, but deny the motion with respect to direct damages.

Rule 702 states that,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This standard boils down to a three-prong analysis: (1) whether the expert is properly qualified; (2) whether the testimony's reasoning or methodology is scientifically reliable; and (3) whether the testimony assists the trier of fact in understanding the evidence or determining a fact. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) & Fed. R. Evid. 702).

Under this rule, an expert must explain the methodology and principles supporting the opinion and the opinion must amount to "more than a 'bottom line.'" *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). For

example, this court has excluded the testimony of an expert as to whether mixing a chemical with water would cause an explosion because the opinion was based only upon reading a material safety data sheet for the product, the product container label, an incident report, and another data sheet. *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 801-02 (E.D. Wis. 2010). As the court noted, the expert's methodology was "at best, parroting the conclusions of the authors of [the] data sheets." *Id.* at 802. Basing the opinion that a chemical reaction would occur on the conclusion of another person that a chemical reaction would occur was logically circular and an unreliable methodology. *Id.* The testimony provided only a conclusion that any other person reading the materials would reach. *Id.* Similarly, this court has also found an expert's testimony unreliable where it was based upon wholesale adoption of a number provided by the defendant itself as to how many product units it *hoped* to have on the market. *Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887-88 (E.D. Wis. 2010). The expert did not scrutinize or otherwise verify the accuracy of the data on which he based his opinion, instead merely parroting the predictions of the defendant's executives. *Id.* at 888-89. Moreover, the Seventh Circuit has upheld the exclusion of accounting expert testimony "when it became evident that he would do no more than make basic arithmetical computations with figures supplied to him by counsel". *United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972).

1.    Testimony as to Direct Damages

Heverly and One2One's counterclaims include damages for unpaid revenue, postage deposits, material costs, escrow agent costs, interest costs, lease terms, contract pricing reductions with Bright House Network, and

contract changes with Insight Communications. Quad urges that Gotter received the evidence of these damages directly from Heverly and One2One but did not independently audit, analyze, or otherwise verify its accuracy (*e.g.*, Gotter Dep. 140:9-141:15, 144:3-146:18) (Docket #135-2). At first glance, it appears Gotter simply took the numbers, plugged them into his report, and then used simple math to add them up. (*See* Gotter Damages Report 4-11) (Docket #135-1). However, in response to the motion, Gotter has submitted a declaration explaining the work performed in assessing the direct damages. In many cases, Gotter reviewed underlying documents for mathematical accuracy, traced information to other documents including cost-sharing spreadsheets and invoices, and went over the materials with One2One officials. (Gotter Decl. ¶ 9.A) (Docket #159). In fact, in one example, certain damages were eliminated because it was discovered that One2One's client had not actually been invoiced; according to Gotter, this was only discovered after his query for documentation to support the amount. (Gotter Decl. ¶ 9.A.(7).5.a). In light of the work done to verify the numbers provided by Heverly and One2One, Gotter's opinion as to direct damages appears to provide more than a bottom-line conclusion parroted from numbers provided by Heverly and One2One. As such, the court will deny Quad's motion with respect to direct damages.

### 2. Testimony as to Lost Profits

If allowed, Gotter will testify as to two major forms of lost profits: lost business due to "Sales Channel Development Delays," and lost profits from a marketing campaign with Insight Communications that did not occur.

a.    Lost Profits from Sales Channel Development Delays

The lost profits from Sales Channel Development Delays ("Sales Channel Lost Profits") allegedly flow from the fact that termination of the Openfirst–One2One relationship forced One2One to shift its sales team to work with existing customers, and as a result did not secure new business it otherwise would have.  One2One supposedly had sales leads for 30,000,000 "pieces-per-month" (each potential statement printed constitutes a "piece"), would have secured (or "closed") 20% to 25% of these leads, would have secured that volume of work for anywhere from thirty-six to forty-four months, and would have made $0.10 to $0.15 of revenue per statement.  The 30,000,000 pieces-per-month is actually the aggregate volume expected from fifty-four companies for which One2One had sales leads.  (Brammer Dep. 70:7-15) (Docket #143-3).  Quad makes three arguments as to Gotter's opinion regarding the Sales Channel Lost Profits: Gotter did not use a reliable methodology in verifying the accuracy of the 30,000,000 pieces-per-month number or the 20% to 25% closing rate; Gotter essentially parroted One2One's projections; and Gotter never reviewed whether One2One was in fact *more* profitable after its relationship with Openfirst ended, in which case there would be no damages.

However, there is a larger flaw with Gotter's methodology.  Gotter applies the 20% to 25% closing rate to the 30,000,000 pieces-per-month, yet according to the deposition of One2One's Chief Operating Officer, Richard Brammer ("Brammer"), the 20% to 25% closing rate was estimated by looking at One2One's historical closing rate for leads on *customers*.  (*See* Brammer Dep. 73:7-13, 80:8-9, 82:18-84:9).  As such, the 20% to 25% rate applies more appropriately to how many of the fifty-four company leads One2One would

have closed. But there is no other evidence to establish which of the fifty-four leads were accountable for any given number of pieces-per-month. Accordingly, while it might be accurate to apply a 20% closure rate to fifty-four companies, arriving at roughly ten new customers, that would not necessarily mean the same thing as 20% of 30,000,000 pieces-per-month because it is highly unlikely, and in any event unsupported, that each customer accounts for an equal share of the potential pieces-per-month. As such, the estimated 20% to 25% closure rate for leads on new clients should not be applied directly to the 30,000,000 pieces-per-month number – such application is unreliable at best. Thus, the court will exclude Gotter's testimony on the Sales Channel Lost Profits as using an unreliable methodology.

> b.    Lost Profits from Canceled Insight Marketing
>        Campaigns

Quad also challenges Gotter's testimony with regard to lost profits from canceled marketing campaigns with Insight Communications. Quad complains that Gotter did not speak with anyone at Insight to determine why they did not launch the marketing campaigns, and further that the thirty-six-month contract term Gotter used has no basis because the memo from Brammer on which Gotter relied states that the potential length of the campaigns was unknown. In response, Gotter's declaration states that an executive for Insight will testify at trial as to the anticipated nature of the marketing campaigns and any reasons for not following through. (Gotter Decl. ¶ 9.C). But even if true, there is nothing to show that Gotter has done anything beyond take numbers provided by One2One and add them up. That type of analysis is not useful to the jury, and to the extent Heverly and One2One will establish the existence of the damages through testimony by

Insight, that will be sufficient to put the evidence in front of the jury. As such, the court will also grant Quad's motion with respect to Gotter's opinion on lost profits from the cancelled Insight marketing campaigns.

### 3. Testimony as to Reputational Damage

Gotter's expert report also states his opinion that Heverly and One2One suffered a minimum damage of $1,000,000 as a result of Openfirst's communications with certain of One2One's customers. (Gotter Damages Report 15). During his deposition, Gotter explained the number not as one supported by hard numbers, but rather "a judgment call." (Gotter Dep. 161:11-162:13). As Gotter put it, he was "just trying to put a number in front of the court that says this is a substantial situation and there should be a substantial number there." (Gotter Dep. 164:6-9). Gotter admitted he could not recall having ever been asked to provide an estimate for reputational loss before, and after comparing the analysis to one for lost future earnings he noted that the instant analysis was "much less scientific than that," using no specific standards, methodologies, formulas, or things other experts may use to estimate reputational damage. (Gotter Dep. 162:14-164:6).

Taking into account that Gotter has never previously provided an estimate for reputational damage, that he admitted not using any specific methodologies, formulas, or other methods for creating the estimate, and based upon his own characterization of the estimate as a "judgment call," the court finds the testimony would not be reliable, or of any help to a jury. The $1,000,000 figure is entirely speculative. As such, the court will exclude Gotter's testimony as to damages flowing from reputational loss as well.

B.    Motion to Exclude Evidence Relating to Settlement
      Agreement and Escrow Agreements

Quad's next motion (Docket #140) requests the exclusion of all evidence, argument, or testimony related to the July 6, 2006 Escrow Agreement, the November 2007 Settlement Agreement, and the November 30, 2007 First Amendment to Escrow Agreement. The court will deny this motion. Quad first argues that the agreements are protected settlement communications that should not be admissible. Evidence of furnishing (or offering) consideration in the compromise of a claim, as well as conduct and statements made in compromise negotiations, are inadmissible if used to prove liability for, validity of, or the amount of a disputed claim. Fed. R. Evid. 408(a). Such evidence may be admitted if offered for another purpose, including proving witness bias or prejudice. Fed. R. Evid. 408(b). The primary policy behind the rule is to avoid discouraging settlement negotiations. *Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 423 (7th Cir. 1987).

As noted, the disputes in this case generally arise from a business relationship between Heverly and One2One, and Openfirst. After Quad purchased a controlling interest in Openfirst, it entered into an Escrow Agreement with the Management Group which would serve as the first source of funds in order to secure the indemnification obligations of the Management Group. Quad, after terminating the relationship with Heverly and One2One, later delivered a claim notice pursuant to the Escrow Agreement, resulting in a Settlement Agreement and First Amendment to Escrow Agreement between Quad and the Management Group in order to resolve the indemnification claim. Quad now seeks to exclude evidence of the agreements because it claims they are protected settlement

communications. Quad argues that Heverly and One2One may attempt to introduce the evidence to show witness bias or prejudice, thereby falling under the subsection (b) exception; Heverly and One2One confirm this intent in their briefing. However, according to Quad, admission of such evidence would impermissibly create the inference that the Management Group is liable for Heverly's and One2One's claims against them. Thus, it appears Quad is arguing that, should Heverly and One2One offer to introduce the evidence under subsection (b), that would not be the true intent, and it should still be excluded under subsection (a). But Quad attempts to push the rule too far. Quad's argument that the agreements will cause jurors to draw an impermissible inference assumes that an agreement to indemnify Quad *if* Heverly and One2One succeed on their claim would be nearly indistinguishable to jurors from an admission that Heverly and One2One *will or should* win. That stretches too far. Further, the argument appears actually aimed at prejudice, which Quad argues in the alternative. As such, where Heverly and One2One seek to admit the evidence for a purpose within the exceptions of subsection (b), it should not be barred under Rule 408.

In this vein, Heverly and One2One's brief states exactly that. They stress that the agreements will be used only to show potential bias on the part of the Management Group. According to Heverly and One2One, the Settlement Agreement requires the Management Group to "provide any assistance reasonably requested by [Quad]," and to "act in a manner with respect to a proceeding that is as favorable as possible to [Quad]." The money held in escrow, according to Heverly and One2One, will be paid out to the Management Group assuming no liability is found on the part of Quad. As such, Heverly and One2One are plainly correct that the

contractual provisions requiring cooperation, as well as the financial incentive to do so, bear directly on the potential bias of the Management Group. Thus, the agreements fall squarely under the exception in subsection (b) and should not be excluded under Rule 408.

Alternatively, Quad argues that the evidence should be excluded as overly prejudicial under Rule 403. Per that rule, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Quad argues that admission of the agreements would be unfairly prejudicial because the fact of entrance into the agreements alone "would make a deep impression on the jury." However, Quad gives jurors too little credit. The documents merely evince an agreement to cooperate with Quad in defending any potential litigation, and to indemnify Quad (through loss of escrow funds) should the Management Group be found liable. It is incorrect to assume that jurors cannot comprehend the concept of indemnity. Thus, the risk of prejudice here is not such that it substantially outweighs the probative value of these documents in showing potential bias. The court will deny Quad's motion with respect to excluding the agreements..

C.    Motion to Exclude Claim for Future Lost Profits from Sales Channel Development Delays

Quad's third motion (Docket #142) requests that Heverly's and One2One's claim for the Sales Channel Lost Profits be excluded as a matter of law under Rules 701, 702, and 403. However, in its brief, Quad makes no actual appeal to Rule 403, which concerns excluding otherwise relevant evidence on the basis of prejudice, confusion, or waste of time. Fed. R. Evid.

Case 2:09-cv-00099-JPS   Filed 09/23/11   Page 13 of 28   Document 182

403.  As such, the court will not make Quad's argument for it.  With respect to Quad's actual arguments, the court will deny the motion.

As noted previously, the Sales Channel Lost Profits allegedly flow from the fact that termination of the Openfirst–One2One relationship forced One2One to shift its sales team to work with existing customers, and as a result did not secure new business it otherwise would have.  One2One supposedly had sales leads for 30,000,000 "pieces-per-month" (each potential statement printed constitutes a "piece"), would have secured (or "closed") 20% to 25% of these leads, would have secured that volume of work for anywhere from thirty-six to forty-four months, and would have made $0.10 to $0.15 of revenue per statement.  The 30,000,000 pieces-per-month is actually the aggregate volume expected from fifty-four companies for which One2One had sales leads.  (Brammer Dep. 70:7-15).  Through this motion, Quad challenges only testimony regarding two of the key components:  the alleged 30,000,000 pieces-per-month, and the 20% to 25% closing rate.

Quad first argues that the testimony of Gotter, Heverly and One2One's expert, may not be used to establish either of these components because he was essentially fed these numbers by Richard Brammer ("Brammer"), One2One's Chief Operating Officer at the time.  In its response brief, One2One does not dispute this point, and the court takes the position that Gotter's testimony cannot independently establish these alleged facts.  Gotter's testimony, otherwise, is dealt with above.  Quad next argues that Brammer himself should not be allowed to offer testimony to establish either of these facts because his testimony as to the 30,000,000 pieces-per-month is based upon hearsay, not personal knowledge or his own perceptions.  Quad further argues that Brammer's estimate of a 20% to 25% closing rate is not

Case 2:09-cv-00099-JPS   Filed 09/23/11   Page 14 of 28   Document 182

based on personal knowledge and is unreliable. The court will deny Quad's motion as to both these points.

Under Wisconsin law, "lost profits need not be proven with absolute certainty, but the claimant must produce sufficient evidence . . . on which to base a reasonable inference as to a damage amount." *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶ 38, 281 Wis. 2d 448, 699 N.W.2d 54; *see also Reiman Assocs., Inc. v. R/A Adver., Inc.*, 306 N.W.2d 292, 302 (Wis. App. 1981) (damages need not be mathematically certain, only estimable with "reasonable certainty"). Lay opinion is governed by Rule 701 which requires opinions or inferences be: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This standard thus includes the requirement that the lay witness, unlike an expert, have personal knowledge and not rely on hearsay. Fed. R. Evid. 602; *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 864 (7th Cir. 2009). Where a lay witness' opinion is otherwise based on scientific, technical, or other specialized knowledge, Rule 702 applies. *United States v. Conn*, 297 F.3d 548, 553 (7th Cir. 2002). However, "[k]nowledge acquired through others may still be personal knowledge within the meaning of [Rule 602], rather than hearsay." *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989). In *Agfa-Gevaert*, the court, without deciding, questioned the exclusion of testimony by a company's board of directors regarding the quality of a product. *Id.* The district court had excluded the statements because the board based its inferences of quality upon what customers and engineers had told the board members. *Id.* The Seventh Circuit noted that the board's

"assessments are inferential, and as long as they are the sorts of inference that businessmen customarily draw they count as personal knowledge, not hearsay." *Id.*

Heverly and One2One first make a blanket argument that Quad's entire motion is actually a disguised dispositive motion. Quad's motion is indeed slightly ambiguous, in that it asks the court to exclude the entire claim for Sales Channel Lost Profits as a matter of law. However, Quad's arguments appeal directly to the rules of evidence and deal only with questions of admissibility. As such, the court will treat the motion as one merely seeking to exclude some testimony.

1.    Brammer's Testimony as to the 30,000,000 Pieces-Per-Month

The court will deny Quad's motion with respect to excluding Brammer's testimony that sales leads amounted to a potential 30,000,000 pieces-per-month. Quad argues that Brammer's testimony respecting the alleged 30,000,000 pieces-per-month is based upon merely repeating information relayed to him by One2One's sales staff, rather than personal knowledge or perception. According to cited portions of his deposition, Brammer did not get the volume numbers directly from clients, but rather from sales representatives. (Brammer Dep. 70:25-71:7) (Docket #162-1). Brammer also supposedly did little to independently verify the numbers provided by sales representatives. (Brammer Dep. 71:8-17). But, by the same token, in estimating the 30,000,000 number, Brammer used reports submitted to One2One executives, as well as conversations held with sales representatives to establish that fifty-four companies provided the leads. (Brammer Dep. 64:3-66:2). Brammer further testified that he was involved

at some level with the sales investigation for all fifty-four leads. (Brammer Dep. 76:22-78:23). On the basis of Brammer's involvement with the sales side of the business, recognizing his position as the Chief Operating Officer, the court finds Brammer has sufficient personal knowledge to testify as to the 30,000,000 pieces-per-month.

        2.      Brammer's Testimony as to the 20% to 25% Closing Rate

As to Brammer's opinion regarding the 20% to 25% closing rate on leads, Quad argues that Brammer has no personal knowledge as to why individual customers chose not to contract with One2One, used no reliable methodology to determine the closing rate, and used blanket closing rate numbers that do not account for individual leads' potential volume of business or likelihood to contract with One2One. With the understanding that Brammer cannot testify as to the application of the closure rate to the pieces-per-month number, the court will deny Quad's motion on this issue as well.

Quad's first two arguments attempt to place Brammer's testimony outside both the lay opinion and expert opinion requirements. However, as Quad acknowledges, Brammer testified that he calculated the 20% to 25% closing rate by looking at One2One's previous history with the number of leads versus the number of closed sales. He apparently arrived at a historical number near 35% and then determined that a more conservative 20% to 25% estimate was reasonable. (Brammer Dep. 73:7-13). This is again based upon sufficient personal knowledge given his position as Chief Operating Officer and the use of an actual historical closing percentage. Alternatively, if the court were to view Brammer's testimony on the closing rate as "expert"

opinion based on specialized knowledge, the historical closing rate, combined with Brammer's specific knowledge of the business as Chief Operating Officer, is sufficient to offer an opinion as to an estimated closing rate. However, Quad argues that One2One has failed to produce any documentation to support Brammer's conclusion as to this historical number. Quad's argument focuses on Brammer's deposition, during which he stated that he could not recall specific numbers of leads or individual closing rates for particular years. (Brammer Dep. 73:14-74:19). However, Brammer also testified at the deposition that he simply could not remember individual figures off the top of his head, but that he could do so after reviewing the sales reports used to develop his estimate. (Brammer Dep. 74:13-19). Thus, there is no reason to exclude Brammer's testimony for a lack of personal knowledge or reliability.

Finally, Quad argues that Brammer's application of the 20% to 25% closure rate to the 30,000,000 piece-per-month number fails to account for individual customer volumes and circumstances. However, it does not appear that Heverly and One2One seek to introduce Brammer's testimony in a manner that actually applies his estimated closing rate to arrive at the potential number of statements sold. Instead, it appears the application of the closing rate to pieces-per-month will be offered by Gotter as his expert opinion on damages. While it is unreliable for Gotter to apply a client-closing percentage to an overall piece-per-month number, and the court has accordingly excluded such,[2] it does not appear that will be the substance of Brammer's testimony. Thus, the court will deny Quad's motion as to Brammer's testimony regarding the closing rate, though Brammer would

_____

[2] See the discussion in Section II.A.2.a.

remain barred in the same manner as Gotter from testifying as to the application of the closing rate to the 30,000,000 pieces-per-month.

### D. Motion to Exclude Claim for Bright House Price Reduction Damages

Quad filed its final motion (Docket #166) well past the deadline for filing motions *in limine*, but the court will resolve it nonetheless. Quad requests exclusion of Heverly's and One2One's claim for damages resulting from the price differential between One2One's initial potential contract with Bright House and a later contract actually entered. One2One and Heverly respond, first that Quad's motion is improper, and second that they nonetheless will introduce sufficient evidence at trial.

Quad is correct that damages must be proven. *MindGames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000). But whether a party has proven (or can prove) damages is a question for either the jury, or the court on a dispositive motion. Motions *in limine* are intended to decide issues of admissibility, not dispose of claims. *See Wells Fargo Bank, N.S. v. Siegel*, No. 05-C-5635, 2007 WL 1118442, at *3 (N.D. Ill. April 16, 2007) (refusing to rule on motion *in limine* that asked to bar evidence or argument related to oral contract because contract was supposedly invalid under statute of frauds; motion was actually dispositive, and thus untimely); *Klatch-Maynard v. Sugarloaf Twp.*, No. 06-CV-845, 2011 WL 3476814, at *2 (M.D. Pa. Aug. 9, 2011) (collecting district court cases); *see also* Black's Law Dictionary, *motion in limine* (9th ed. 2009). As One2One and Heverly note in their responsive brief, Quad's motion is actually a disguised motion for partial summary judgment. Quad essentially asks the court to grant it judgment on this particular form of damages because there is supposedly insufficient proof, merely cloaking

its argument in the language of the Federal Rules of Evidence. It argues that three particular forms of evidence that Heverly and One2One *might* introduce to establish the damages at trial are inadmissible and that there is a resulting lack of proof. Even if certain testimony is ultimately inadmissible (Quad makes only brief, generalized arguments), the question of whether damages have been proved is for the jury, or perhaps the court by motion made after all evidence has been introduced. This conclusion is bolstered by One2One's and Heverly's response which discusses a range of testimony that they believe will in fact prove the damages at issue. Thus, there is clearly a factual dispute here, and to the extent Quad disagrees with that conclusion, it only reinforces the notion that its motion is one for judgment, not a ruling on admissibility. As such, the court will deny Quad's untimely dispositive motion.

II.    HEVERLY'S AND ONE2ONE'S MOTIONS

The court will grant Heverly's and One2One's motion with respect to excluding testimony regrading the reason for Nicholas Grimaldi's ("Grimaldi") termination from Openfirst (Docket #145). Because the reason is allegedly sexual harassment and sending inappropriate messages, it is not relevant and would be overly prejudicial in any event. As to Heverly and One2One's motion to exclude testimony as to any terms of the alleged oral contract not included in the complaint (Docket #148), the court will deny that motion because it rests on an improper assumption that a complaint must explicitly state all facts a party wishes to prove at trial.

A.    Testimony of Nicholas Grimaldi, Former Openfirst Employee

Heverly's and One2One's first motion (Docket #145) seeks to exclude any evidence regarding the reason for Grimaldi's termination. Because it is

not relevant and would be prejudicial in any event, the court will grant the motion. Per Rule 402, only relevant evidence is admissible, that is, evidence having any tendency to make the existence of any fact of consequence more or less probable than without the evidence. Fed. R. Evid. 401, 402. Otherwise relevant evidence may be excluded where the probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Here, Heverly and One2One will seek to introduce testimony by Grimaldi as to his interactions with One2One representatives while an Openfirst employee, as well as his knowledge regarding Openfirst operations. However, Grimaldi was apparently terminated from Openfirst due to allegations of sexual harassment and transmitting emails containing inappropriate sexual content. Heverly and One2One seek to exclude such evidence as irrelevant, or alternatively as overly prejudicial.

Heverly and One2One are correct, and such evidence should be excluded. Allegations of sexual harassment and inappropriate emails are not relevant to this case, and further would have no bearing on Grimaldi's propensity for truthfulness were they offered to impeach him. Even if they were somehow relevant, the level of prejudice would substantially outweigh the probative value given the immediate emotional reactions jurors would likely have. While the fact of Grimaldi's termination itself may be relevant to showing some type of bias, it is unnecessary to state the reasons behind the termination. As such, the court will grant the motion, allowing testimony with regard to the fact of Grimaldi's termination, but excluding testimony with regard to the specific reasons for termination.

B.    Testimony Regarding Terms of the Oral Contract

Heverly's and One2One's other motion (Docket #148) seeks exclusion of any testimony that would modify, add to, or contradict the terms of the oral contract between One2One and Openfirst as alleged in Quad's complaint. Because it rests on a faulty underlying assumption, the court will deny this motion. Heverly and One2One again argue a lack of relevance, as well as unfair prejudice per Rules 402 and 403. As noted, only relevant evidence is admissible, that is, evidence having any tendency to make the existence of any fact of consequence more or less probable than without the evidence, unless the probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 401, 402, 403.

Heverly and One2One first argue that testimony as to any terms not found in Quad's complaint would be irrelevant because the terms in the complaint are the *only* terms against which the parties' conduct may be measured. That argument assumes a broad rule that a party may not introduce testimony as to facts not explicitly set forth in the complaint. But, as Quad notes, a complaint need only contain a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). Moreover, notice pleading does not require that a complaint contain all the evidence needed to prevail at trial, a complaint is "just the starting point." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998). In light of these considerations, there is no reason to limit Quad or the third-party defendants to introducing evidence only as to the exact terms set forth in the complaint. In fact, disputes concerning oral contracts almost universally turn on competing testimony and evidence as to what the terms may have been. It would make little sense to require that a complaint include each specific term, before discovery, and then hold the

plaintiff to that characterization throughout the action. Thus, because a complaint need not operate as such a straightjacket, any evidence or testimony that Quad or the third-party defendants wish to introduce related to the terms of the oral contract is clearly relevant.

Similarly, there is little danger of prejudice or confusion in admitting such testimony. Heverly's and One2One's argument again makes the improper assumption that the complaint sets forth the only terms which may be discussed. In this context, they argue that it would be confusing, misleading, and prejudicial to admit testimony about terms not contained in the complaint. While it might be true that a jury could be confused or misled if testimony referred to terms that were not properly a part of the dispute, as noted above, that underlying assumption is incorrect. As such, because the complaint does not narrow the terms at issue, there can be no confusion or prejudice from introducing testimony that is essentially directly on point. Thus, the court will deny Heverly's and One2One's motion.

III.    THE MANAGEMENT GROUP'S MOTION

As to the Management Group's motion to exclude any testimony, evidence, or argument regarding the alleged defamatory statements (Docket #137), the court will grant the motion to the extent Heverly and One2One seek to introduce hearsay testimony, but will otherwise deny the request as an improper dispositive motion. The Third-Party Complaint makes the following allegations with regard to what the Management Group told at least one of One2One's clients, Tim Lewis of PenCor: (1) Heverly was a liar and not to be trusted; (2) Heverly was "a mere sales agent for Openfirst and that Heverly had misrepresented the nature of his role and the nature of the relationship between One2One and Openfirst"; (3) Heverly and One2One

"had misused trademarks and other intellectual property of Openfirst"; (4) Heverly and One2One "had misappropriated Openfirst's proprietary software"; (5) the statement work done on behalf of PenCor was performed pursuant to an agreement with Openfirst and neither Heverly nor One2One had any rights under the agreement; and (6) Openfirst had only recently learned that One2One had acquired a print facility, without telling Mr. Lewis that One2One had informed Openfirst of the acquisition at least as early as June 12, 2006. (Third-Party Compl. ¶¶ 72-77) (Docket #5). Though filed as one motion, the Management Group asserts two separate bases for excluding the testimony. The Management Group argues that Heverly has no personal knowledge of the conversations sufficient to testify, and that the conversations are inadmissible hearsay. They also argue that the alleged statements should not be admitted as they are not defamatory or slanderous *per se* as a matter of law. The court will grant the motion to the extent it seeks to exclude hearsay testimony as to what the Management Group supposedly told One2One clients, but will otherwise deny the motion as to a lack of personal knowledge. Further, the court will deny the motion with respect to the statements not constituting defamation or slander *per se*.

A. Personal Knowledge and Hearsay

Under the personal knowledge rule, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. The Management Group argues that Heverly admitted at his deposition that he was not a party to the conversations containing the alleged defamation. However, in their response brief, Heverly and One2One assert that they will offer testimony from at least three witnesses who were clients of One2One

and parties to the conversations, as well as testimony of Heverly and/or the Chief Financial Officer as to conversations they had with one or more of those One2One customers. Thus, there is nothing to suggest that Heverly and One2One will offer testimony not based upon personal knowledge.

As to hearsay, a declarant's out-of-court statement offered to prove the truth of the matter asserted is inadmissible unless it falls under an exception. Fed. R. Evid. 801, 802. The Management Group argues that Heverly, One2One, and employees of One2One (or similar parties) may not testify as to what One2One clients told them with regard to the conversations that occurred between the Management Group and the particular client. The Management Group is correct that if Heverly offers testimony as to what a client told him that the Management Group said, it would be hearsay. For example, if Heverly offered testimony that Lewis told Heverly that the Management Group called Heverly a liar, it would be offered to prove the truth of the matter: that the Management Group *told Lewis* that Heverly was a liar. On the other hand, if Lewis himself were to offer such testimony, the matter asserted would not be that the Management Group told Lewis something, but that Heverly is a liar. In that case, it would not be hearsay, as defamation is concerned with the words said, not their truth, and that testimony would not be offered to prove that Heverly is a liar. Thus, to the extent Heverly and One2One offer direct client testimony as to what the Management Group said, that is admissible.

Heverly and One2One also argue that any testimony with regard to what clients told them would fall under the hearsay exception for then-existing mental, emotional, or physical condition. That rule permits admission of a hearsay statement, regardless of the declarant's availability,

if offered to show the existence of a state of mind, emotion, sensation, or physical condition at the time of the statement. Fed. R. Evid. 803(3). Heverly and One2One argue that the statements will explain Heverly and the Chief Financial Officer's state of mind after hearing about the defamatory statements, but the brief makes it unclear why such testimony would be relevant, *see* Fed. R. Evid. 402. Further, the exception under Rule 803(3) applies to showing the *declarant's* state of mind, not that of the party that hears the statement. It is true that a statement may also be introduced to show the hearer's state of mind, *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993), but that case simply recognizes that a statement is admissible where it is offered for a purpose other than to prove the truth of the matter asserted. Here Heverly and One2One claim the statements will explain why they took the "responsive action" they did, but such a vague statement gives the court little on which to judge the argument. As such, the court will grant the Management Group's motion to the extent Heverly or One2One offer Heverly or an employee's testimony as to what clients told them was said by the Management Group. The court is willing to revisit this ruling should Heverly and One2One provide a more persuasive explanation for why the recitation of what clients said the Management Group told them is not offered to prove that the Management Group in fact told the clients such. However, testimony directly from any client is admissible.

> B. Precluding Presentation of Statements as Defamatory or Slanderous *per se* as a Matter of Law

The Management Group next argues that none of the alleged statements, or evidence or argument related to them, should be admissible because they do not, as a matter of law, constitute defamation or slander *per*

*se*. The Management Group cites to Rules 401, 402, and 403, but only in the heading of their brief. As Heverly and One2One point out, the motion is really the equivalent of a dispositive motion, akin to one for summary judgment. Motions *in limine* are typically improper vehicles for such. *Wells Fargo Bank, N.S. v. Siegel*, No. 05-C-5635, 2007 WL 1118442, at *3 (N.D. Ill. April 16, 2007); *see also Klatch-Maynard v. Sugarloaf Twp.*, No. 06-CV-845, 2011 WL 3476814, at *2 (M.D. Pa. Aug. 9, 2011) (collecting district court cases). As the dispositive motion deadline has passed, that is reason enough to deny the motion. Even if that were not the case, the court has serious doubts that the Management Group's argument would carry the day.[3] In any event, the Management Group's request is improper in this context and the court will deny the motion.

Accordingly,

IT IS ORDERED that the plaintiff's Motion to Exclude Expert Testimony of Daniel Gotter (Docket #133) be and the same is hereby GRANTED in part and DENIED in part;

---

[3]The Management Group attempts to characterize the alleged defamatory statements as "commercial speech," but it appears fairly apparent that statements referring to a person as a liar who misrepresents himself and his company while misusing the trademarks and intellectual property of others qualify as defamation and slander *per se*. *Vultaggio v. Yasko*, 572 N.W.2d 450, 452 (Wis. 1998) (statement defamatory where it harms reputation and deters others from associating or dealing with the person); *Freer v. M & I Marshall & Ilsley Corp.*, 2004 WI App 201 ¶ 11, 276 Wis. 2d 721, 688 N.W.2d 756 (defamation of a party in its business, trade, profession, or office is a form of slander *per se*); *see also* Restatement (Second) of Torts § 573 cmt. c (defaming a party in its business involves anything disparaging or tending to harm the party in its business, including calling into question honesty in business).

IT IS FURTHER ORDERED that the plaintiff's Motion to Exclude Evidence of Settlement Agreement and Escrow Agreements (Docket #140) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the plaintiff's Motion to Exclude Defendants' Claim for Future Lost Profits for Sales Channel Development Delays (Docket #142) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the plaintiff's Motion to Exclude Defendants' Claim for Bright House Price Reduction Damages (Docket #166) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' Motion to Exclude Reasons for Termination of Nicholas Grimaldi (Docket #145) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the defendants' Motion to Preclude Testimony Regarding Contract Terms Differing from Complaint Allegations (Docket #148) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the third-party defendants' Motion to Exclude Testimony or Argument Regarding Defamatory Statements (Docket #137) be and the same is hereby GRANTED in part and DENIED in part.

Dated at Milwaukee, Wisconsin, this 23rd day of September, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge