# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| QUAD/GRAPHICS, INC., | |
| Plaintiff, | |
| v. | Case No. 09-CV-99-JPS |
| ONE2ONE COMMUNICATIONS LLC, and BRUCE HEVERLY, | |
| Defendants and Third-Party Plaintiffs, | |
| v. | |
| OPENFIRST LLC, ROBERT KRAFT, RICHARD ZAGORSKI, CHARLES OLSZEWSKI, SCOTT KOSSORIS, and JAMES NASH, | ORDER |
| Third-Party Defendants, and | |
| WESTCHESTER FIRE INSURANCE COMPANY, | |
| Intervenor. | |

On February 28, 2012, plaintiff Quad/Graphics, Inc. ("Quad") filed a Renewed Motion for Judgment as a Matter of Law and Motion to Amend Judgment (Docket #217). That same day, defendants and third-party plaintiffs One2One Communications LLC ("One2One") and Bruce Heverly ("Heverly") filed a Motion after Verdict Pursuant to Rule 50(b) and Rule 59 (Docket #220).

These motions come after entry of judgment following the jury's return of a special verdict (Docket #202) in this case finding that the defendants breached fiduciary duties, tortiously interfered with a contract, tortiously interfered with a prospective contract, and breached a contract.[1] The jury awarded compensatory damages, as well as punitive damages. The jury rejected the majority of counterclaims against Quad, but did find that it converted certain monies belonging to One2One. The jury awarded compensatory and punitive damages there as well. After the close of evidence, but prior to submission of the case to the jury, both Quad and the defendants moved for judgment as a matter of law under Rule 50, stating various grounds for doing so. The court took those motions under advisement and both parties have now renewed the motions post-judgment.[2] Both parties have also requested either a new trial or amendment of the judgment under Rule 59. The court deals with each motion in turn, ultimately denying both, while offering Quad the opportunity to accept remittitur.

1.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 50, a court ruling upon a renewed motion for judgment as a matter of law may allow judgment on the verdict, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b). In order to enter judgment as a matter of law, the court must find "that a reasonable jury would not have a legally sufficient

---

[1] The jury found the defendants liable for wronging Openfirst LLC ("Openfirst"). Quad brought this action standing in Openfirst's shoes subsequent to acquiring it.

[2] The court earlier disposed of one issue raised by Heverly and One2One. (*See* Docket #212).

Case 2:09-cv-00099-JPS   Filed 06/21/12   Page 2 of 27   Document 244

evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The court views the evidence "in the light most favorable to the nonmoving party." *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 343 (7th Cir. 1995).

Under Rule 59, the court may grant a new trial on all or some issues, or it may alter or amend a judgment. Fed. R. Civ. P. 59(a)(1), (e). In assessing whether a new trial is warranted under Rule 59(a), the court looks to whether "the verdict is against the weight of evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Westchester Fire Ins. Co. v. Gen. Star Indem. Co.*, 183 F.3d 578, 582 (7th Cir. 1999). Finding that a verdict is against the weight of evidence is a separate standard from that of granting judgment as a matter of law, and thus a court may find a new trial warranted despite the existence of substantial evidence. 11 Wright et al., Federal Practice & Procedure § 2806 (2d ed.). However, when granting a new trial based solely on the verdict being against the weight of evidence, the record must show the verdict resulted in a miscarriage of justice, "cries out to be overturned," or shocks the conscience. *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995).

In order to alter or amend a judgment under Rule 59(e), the moving party must present the court with newly discovered material evidence, or the court must find a manifest error of law or fact. *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996). A manifest error must be clearly established by the movant. *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986). Manifest error means "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

2.  DISCUSSION

As discussed at greater length below, the court will deny both the plaintiff's and the defendants' motions, though denial of the defendants' motion is partially contingent on Quad accepting remittitur of its compensatory damages. Quad's motion asks the court to amend the judgment, vacating the award of compensatory damages against it. It further asks for judgment as a matter of law denying punitive damages or, alternatively, amendment of the judgment vacating the award.

One2One and Heverly's motion ask for judgment as a matter of law or, alternatively, for a new trial or amendment of the judgment. In poorly organized fashion, they argue: insufficient evidence to support a finding of breach of contract and breach of fiduciary duty; insufficient evidence to support findings of breach of contract and breach of fiduciary duty to the extent they are based upon a duty to secure new contracts with certain customers on behalf of Openfirst; insufficient evidence to support the finding of agency underlying the breach of fiduciary duty; insufficient evidence to support a finding of tortious interference with prospective contract as to certain customers (Insight and Bright House); and, that finding tortious interference with prospective contract as to all relevant customers (Insight, Bright House, and Pencor) was against the weight of evidence or, alternatively, a manifest error of fact, requiring a new trial or alteration of the judgment. The defendants additionally request a new trial on the claims for breach of contract, breach of fiduciary duty, and tortious interference with contract. They also request a new trial because of an allegedly inconsistent verdict. Finally, One2One and Heverly request dismissal of the punitive

damages against them because of a lack of sufficient evidence, and "infirmities" and "inconsistencies" in the verdict.

## 2.1     Quad's Motion

Quad first argues that, because the jury found that One2One and Heverly were agents of Openfirst and breached fiduciary duties, the court should amend the judgment to vacate the compensatory damages awarded to the defendants for Quad's conversion.[3] Next, Quad argues that the jury's award of punitive damages is not supported by any evidence and thus the judgment should be amended to vacate that award as well.

### 2.1.1     Compensatory Damages for Conversion

Generally, an agent is not entitled to compensation for conduct constituting a breach of loyalty. Restatement (Second) of Agency § 469 (1957). The Supreme Court of Wisconsin has stated that it has not "adopt[ed] the rigid, mechanical rule…that compensation is automatically denied to the agent during the period in which he has committed a wilfull [sic] and significant breach of [the] duty of loyalty." *Hartford Elevator, Inc. v. Lauer*, 289 N.W.2d 280, 287 (Wis. 1980). The *Hartford* court concluded that,

> whether the agent should be denied all or any part of his compensation during the period in which he breached his duty of loyalty depends on consideration and evaluation of the relevant circumstances with a view to avoiding unjust enrichment of or unjust deprivation to either the employer or employee.

---

[3]While Quad brought this action standing in Openfirst's shoes, the defendants counterclaimed against Quad as to a conversion that occurred after Quad acquired Openfirst, as well as making a third-party claim for conversion against Openfirst itself.

*Id.*; *see also Century Capital Grp. v. Barthels*, 539 N.W.2d 691, 695 (Wis. Ct. App. 1995) ("whether to allow compensation to a [disloyal] fiduciary rests within the discretion of the trial court").

Quad argues only that because the jury found that Heverly and One2One acted as agents, and breached their fiduciary duties, they are not entitled to any compensation as a matter of law. As such, Quad argues that the defendants effectively lost legal right to the converted "commissions." That is not a correct reading of Wisconsin case law, however. A disloyal agent's entitlement to compensation depends upon the circumstances; it is not foreclosed as a matter of law. As such, Quad has failed to clearly establish that an award of compensatory damages is a manifest error of law.

### 2.1.2 Punitive Damages for Conversion

Wisconsin law allows an award of punitive damages where evidence shows the defendant acted "maliciously" or "in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). One2One and Heverly argue in support of punitive damages only under the intentional disregard standard, which is defined as action "with a purpose to disregard the plaintiff's rights," or acting while "aware that his or her acts are practically certain to result" in the disregard. *Boomsma v. Star Transp., Inc.*, 202 F. Supp. 2d 869, 881 (E.D. Wis. 2002). Punitive damages must be proven with clear and convincing evidence. *Franz v. Brennan*, 431 N.W.2d 711, 713 (Wis. Ct. App. 1988). Quad first argues that, because Wisconsin agency law strips the defendants of any entitlement to compensatory damages, there is likewise no basis for awarding punitive damages as a matter of law. However, because that premise fails, the conclusion as to punitive damages fails as well. Thus, there is no manifest error of law here.

Quad further argues that the evidence does not support a finding of intentional disregard for the defendants' rights in converting the funds in question. The cases Quad appeals to, however, do not establish that the facts presented to the jury are so incapable of supporting a finding of intentional disregard as to amount to manifest error in the award. Quad first appeals to a Seventh Circuit case affirming the setting aside of punitive damages. *Boyd v. Tornier, Inc.*, 656 F.3d 487 (7th Cir. 2011). However, that case applied Missouri and Iowa law and is, therefore, inapplicable to the situation at hand. *Id.* at 497 (applying Iowa and Missouri law, neither of which mention the "intentional disregard" standard used in Wisconsin).[4] Quad also cites a Western District of Wisconsin case that concerned an award of punitive damages where the jury was instructed, without objection, that such award required the act be done maliciously or wantonly, but with no mention of intentional disregard. *Dombeck v. Milwaukee Valve Co.*, 823 F. Supp. 1475, 1479 (W.D. Wis. 1993), *vacated by* 40 F.3d 230 (7th Cir. 1994). Thus, that case is also unhelpful. Quad also appeals to cases explaining the purpose of punitive

---

[4]Quad argues that *Boyd* remains instructive because the Iowa and Missouri law applied in that case mirror the standard for punitive damages in Wisconsin prior to enactment of the punitive damages statute. Quad then cites *Boomsma* to explain that Wisconsin enacted its statute to make an award of punitive damages more difficult than the pre-statutory standard. *Boomsma*, 202 F. Supp. 2d at 880. Thus, the argument goes, setting aside punitive damages under the previous standard in Wisconsin surely supports setting aside damages under the newer, tougher standard. However, as explained in *Boomsma*, Wisconsin's prior standard required showing only "reckless indifference" or "disregard of the rights of others." *Id.* The standard did not even require showing malice, let alone intentional disregard. *Id.* Yet the Missouri and Iowa law applied in *Boyd did* involve malice, but not intentional disregard. *Boyd*, 656 F.3d at 497. Thus, *Boyd* mirrors neither prior nor current Wisconsin law. It therefore cannot be said that the intentional disregard standard is necessarily *more* strict or *as* strict as the *Boyd* malice standard. *Boyd* remains distinguishable and irrelevant.

damages as punishment and deterrence. But analyzing those underlying goals is generally irrelevant, so long as the jury's award was not manifest error.

Instead, Quad's actual quarrel with the award appears to be a simple disagreement as to whether the evidence warranted an inference of intentional disregard. That is little more than a disagreement with the factual conclusions of the jury; yet such is their province. The jurors were entitled to draw inferences from, *inter alia*, communications regarding the withholding of funds, as well as the circumstances surrounding the alleged "blow-up" plan. Quad has not clearly demonstrated manifest error or a lack of sufficient evidence.

Quad also argues that an award of punitive damages is contrary to Wisconsin case law. In support, it cites to cases holding that various conduct amounted only to recklessness, rather than malice or intentional disregard, and then argues that Quad's conduct was not as egregious. The jury disagreed, and Quad has not clearly established that its conduct was not worthy of punitive damages as a matter of law. As such, the court will deny Quad's motion as to both compensatory and punitive damages.

### 2.2    Heverly's and One2One's Motion

Heverly and One2One make a series of arguments against the breach of contract and breach of fiduciary duty findings, as well as against the associated awards of damages. They further take issue with the finding of tortious interference with prospective contract. The defendants also request a new trial on the breach of contract, breach of fiduciary duty, and tortious interference with contract claims, as well as because of an allegedly

inconsistent verdict. Finally, they argue specifically against the award of punitive damages.

### 2.2.1 Breach of Contract, Breach of Fiduciary Duty, and Evidence of Associated Damages

Heverly and One2One's first argument asserts that there was insufficient evidence to support the award of damages associated with both the breach of contract and breach of fiduciary duty because Quad's evidence proved only damages after March 1, 2007, the date on which Quad terminated the business relationship with the defendants. They spend their supporting brief arguing that any breach in either claim occurred prior to March 1, 2007, and that because the relationship ended on March 1, 2007, they could not be liable for any damages occurring after that date. However, in their reply brief, Heverly and One2One appear to abandon this rationale in the face of Quad's response, instead focusing on supposed deficiencies in the evidence itself of contractual and fiduciary duties. As Quad correctly recognizes, the jury was instructed, and Heverly and One2One do not dispute, that damages are to be awarded which are the natural and probable results of breach. There is no requirement that the damages in this case accrue only prior to March 1, 2007. Thus, that argument provides no reason to grant judgment or a new trial to the defendants.

As to Heverly and One2One's quarrel with the evidence supporting a finding of contractual or fiduciary duties, they have not established a lack of evidence, instead merely re-arguing how they would interpret the evidence if they were the jurors. Quad points to the following evidence in the record regarding Heverly and One2One's asserted fiduciary duties and breach:

- Robert Kraft ("Kraft"), head of Openfirst at the time of its dealings with Heverly, testified that Heverly knew the cable television industry, had great sales contacts, but had no production facilities. (Trial Tr. Vol. 2, 448:4-12) (Docket #223).

- Kraft further testified he asked Heverly to represent Openfirst and offered to provide business cards, a place on the website, an office, and an email address. (Trial Tr. Vol. 2, 448:13-16).

- Kraft testified that he told Heverly, "[a]s long as you represent Openfirst, you can use the name. You can enter into deals for us. We'll run the production. We'll bill the client. We'll collect it, and pay you a margin or a commission." (Trial Tr. Vol. 2, 448:16-19).

- Kraft testified he made Heverly the "C.E.O." of Openfirst's statement processing or marketing group in order to give him help in dealing with potential customers. (Trial Tr. Vol. 2, 451:10-20).

- Quad introduced evidence of an unsigned document kept in the regular course of business constituting a draft offer to a customer identifying Heverly as an agent of Openfirst. (Trial Ex. 47, at 8).

- Quad introduced a 2006 email in which Heverly used the Openfirst name while soliciting business. (Trial Ex. 39). Heverly testified that the solicited business would not be directed to Openfirst but would instead be moved to One2One's own recently acquired print facility. (Trail Tr. Vol. 7, 1622:18-1623:11) (Docket #228).

Case 2:09-cv-00099-JPS   Filed 06/21/12   Page 10 of 27   Document 244

- Kate Triller ("Triller"), a former Openfirst employee, testified that, on a call with a Bright House representative, the representative was surprised that Openfirst and Heverly/One2One were separate companies and stated that Heverly was negotiating with Bright House to move business to "Openfirst south." (Trial Tr. Vol. 4, 845:20-846:11) (Docket #225).

- In fact, the Bright House representative apparently believed Triller would continue servicing the account based upon her negotiations with Heverly. (Trial Tr. Vol. 4, 846:22-847:1).

Quad also cites evidence in the record to support a finding of contractual duties and corresponding breach:

- As noted previously, Kraft testified that Heverly could use the Openfirst name if the business was provided to Openfirst who would run the production, bill the client, collect payment, and pay Heverly a margin or commission. (Trial Tr. Vol. 2, 448:16-19).

- Heverly testified that he was asked not to "market" using Openfirst's name without Openfirst's approval; essentially, unless Heverly was going to give the business to Openfirst. (Trial Tr. Vol. 7, 1618:8-12).

- As recited above, some testimony reflected that Heverly used the Openfirst name to solicit business that would not be provided to Openfirst.

Heverly and One2One, however, take issue with this evidence, arguing variously that Quad's citations are mischaracterizations, irrelevant,

and contrary to other "uncontroverted" evidence in the record.[5] They first take issue with the testimony regarding the agreement as to when Heverly could and could not use the Openfirst name. The defendants attempt to make hair-splitting distinctions, but it is unclear how an agreement not to "market" as Openfirst unless the business would go to Openfirst is any different from an agreement not to use the Openfirst name in soliciting business unless that business would go to Openfirst. Heverly and One2One claim that Heverly did not "market" to certain customers in 2006 and 2007 when soliciting new contracts because there is no evidence Heverly promoted the Openfirst logo or Openfirst's skills, but a reasonable jury could infer that an agreement not to "market" as Openfirst without sending the business to Openfirst also includes an agreement not to solicit business using the Openfirst name without sending that business to Openfirst. The defendants' distinction is immaterial.

The defendants also argue that Kraft's testimony with regard to Openfirst and Heverly's relationship is applicable only to the original contracts entered with customers in 2002 and 2003 and that Quad introduced no evidence to show that the relationship continued to exist when Heverly and One2One solicited business in 2006 and 2007. However, the jury was entitled to infer that the relationship between Openfirst and Heverly/One2One retained the same character up until the "termination" of the relationship on March 1, 2007, by Quad. The fact alone that the Bright House representative was surprised to discover that Heverly and Openfirst

---

[5]In certain cases, the court has simply not cited, or instead "properly" characterized the evidence that the defendants assert is either irrelevant or mischaracterized. Because there remains sufficient evidence to prevent the grant of the defendants' motion, it is unnecessary to discuss those complaints in depth.

were separate allows a completely reasonable inference on the part of a jury that Heverly had been acting as an agent during the entire period. Moreover, other evidence in the record provides a basis for finding that the agency relationship continued to exist. For example, Triller testified at length about her working relationship with Heverly and various billing statement customers from her start with Openfirst in 2002 through the termination of the relationship with Heverly and One2One in 2007. (Trial Tr. Vol. 4, 795-850). Among other things, she testified that she directly serviced billing statement customers, albeit sometimes along with Heverly. (*E.g.*, Trial Tr. Vol. 4, 796:5-24, 797:13-22). She also testified that her understanding was that Heverly and Openfirst were "partners, and that [Heverly] was a salesperson and brought the work to Openfirst, and Openfirst serviced all of these accounts and represented – Openfirst jointly, you know, represented along with [Heverly] to those customers." (Trial Tr. Vol. 4, 804:8-12); (*see also* Trial Tr. Vol. 4, 824:20-22) ("Q. In this conversation did anyone from Openfirst say that Bruce Heverly was the sales agent of Openfirst? A. That's how I understood it, the relationship, so –."). She also testified that Openfirst employees would attend sales calls along with Heverly from 2002 to 2006. (Trial Tr. Vol. 4, 838:8-23). In sum, Quad presented sufficient evidence to support a reasonable jury finding that an agency relationship existed for the entire time frame in question.

Heverly and One2One also take issue with the evidence of an unsigned document kept in the ordinary course of business identifying Heverly as an agent. The defendants are correct that testimony at trial reflected that the Openfirst employee that worked on the document with Heverly did not know whether it was the first, third, or sixth draft, for

example. (Trial Tr. Vol. 1, 131:13-22) (Docket #222). He further testified that he thought the copy introduced at trial might be a month or so into the process of collaboration between him and Heverly, but he did not know when the final draft was completed. (Trial Tr. Vol. 1, 132:4-13). The Openfirst employee also testified that he had no knowledge as to what Heverly actually communicated verbally to the client that ultimately received the final draft of the document. (Trial Tr. Vol. 1, 133:3-17). Despite these facts, the document itself, in light of testimony as to having gone through at least a month of collaboration involving Heverly, allows a reasonable inference that an agency relationship existed. This is particularly true in light of the other evidence discussed. While a jury certainly would not be required to come to such a conclusion, doing so on the basis (or partial basis) of this document is reasonable, and that is all that is necessary to uphold that conclusion. The defendants simply wish the jury had come out the other way. The defendants also claim that, despite the "little, if any" relevance of the document to an agency relationship in 2002 and 2003, it has no relevance to 2006 and 2007. But as noted earlier, the document still bears upon the quality of the relationship over the entire time Heverly worked with Openfirst.

Heverly and One2One also complain that the email evidence of Heverly using the Openfirst name is not relevant because it is "based on a false premise." According to the defendants, Heverly "was not asked not to use the name altogether." But again, simply because the email in question did not explicitly refer to and promote Openfirst's abilities and skills does not mean a jury could not infer from the use of Openfirst's name that Heverly was acting in an agency capacity and in contravention of his contractual and

fiduciary duties to Openfirst. The defendants also point to the fact that the agreement attached to that email (Trial Ex. 40) uses only One2One's name and contains no reference to Openfirst. While true, that is evidence to support the defendants' position; it does not itself invalidate contrary evidence, such as the use of the Openfirst name in the email signature block. The jury was entitled to give little or no weight to that evidence in reaching its conclusions.[6]

Finally, Heverly and One2One take issue with Quad's citation to Triller's testimony regarding the Bright House representative's surprise upon learning that Heverly and Openfirst were separate. However, the defendants' only argument is that the representative's surprise "is not surprising" based upon the context and content of the conversation. That is a factual conclusion, and amounts to nothing more than the defendants disagreeing with the jury's synthesis of the evidence put before it.

Separately, the defendants also take issue with the jury's finding of an agency relationship, arguing both insufficient evidence, as well as for a grant of a new trial. They begin with the assertion that there was no evidence that they agreed to act as agents, but then primarily re-hash the evidence. The defendants again argue for their preferred interpretation instead of explaining how a reasonable jury simply could not have found an agency relationship. As discussed above, a reasonable jury could have found an agency relationship from the evidence presented. Ultimately, given the

---

[6]While evidence shows Pencor did not believe it was entering into a contract with Openfirst, but rather with One2One, that is not the dispositive question. Instead, the question is whether Heverly was acting as an agent during those conversations and was breaching a duty of loyalty, or contractual duties, in securing the Pencor work for One2One rather than Openfirst.

Case 2:09-cv-00099-JPS   Filed 06/21/12   Page 15 of 27   Document 244

evidence cited, viewed in the light most favorable to Quad, a reasonable jury could easily find the existence and breach of both fiduciary and contractual duties.

### 2.2.2 Breach Based on Duty to Secure New Contracts

Heverly and One2One also argue that, "to the extent that Quad has asserted" contractual or agency duties to secure renewals of billing statement contracts, there is insufficient evidence to support a finding of breach of contract or fiduciary duty. This argument, particularly couched as it is in a hypothetical, has no relevance. As Quad points out, the jury was instructed to consider whether the defendants violated contractual or fiduciary duties through their means of soliciting work for themselves, not whether a supposed perpetual agreement to secure new work for Quad existed and was breached. Thus, this argument provides no basis for granting judgment as a matter of law or a new trial.

### 2.2.3 Tortious Interference With Prospective Contract

Heverly and One2One next argue that there is insufficient evidence to support the jury's finding of tortious interference with prospective contract with respect to Insight and Bright House. A prospective contract must be sufficiently certain, concrete, and definite. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 689 (7th Cir. 1999). Both Insight and Bright House issued requests for proposals ("RFP"), essentially soliciting new contract offers for after the expiration of their initial five-year contracts. The defendants argue that because those companies issued RFPs, and because both Openfirst and One2One submitted proposals, the prospective contracts at issue between Openfirst and Insight and Bright House were not sufficiently certain, concrete, and definite. They also argue that no evidence was introduced to

establish that the defendants interfered with Openfirst's ability to participate in the RFP process, or that the defendants committed any wrongful conduct during the RFP process.

The simple fact that Insight and Bright House issued RFPs does not by itself destroy the legal sufficiency of the prospective contracts with Openfirst. Testimony from employees of both Bright House and Insight showed that they were likely to enter into renewal contracts prior to the March 1, 2007 calls placed by Openfirst alerting them to the situation (Friedmann Dep. 11:16-23) (Docket #238-1),[7] (Trial Tr. Vol. 4, 952:4-12); calls which, according to testimony, were the first time both Bright House and Insight learned that Heverly was not an Openfirst employee, (Trial Tr. Vol. 4, 845:20-846:11, 846:22-847:1, 987:20-988:7, 995:23-996:17). The court finds the evidence to be sufficient for a reasonable jury to infer that, but for the defendants' actions, Bright House and Insight would have entered into contracts with Openfirst without issuing RFPs. Likewise, it is, therefore, irrelevant that Quad introduced no further evidence showing interference or other wrongful conduct by the defendants within the actual RFP processes.

The defendants argue that this conclusion is based on the incorrect premise that they had a duty to obtain renewal contracts for Openfirst. However, the jury's finding that Heverly and One2One were acting as agents of Openfirst at the time of renewal negotiations is sufficient to support the conclusion regarding the certainty of the contracts. While Heverly and One2One may not have had a universal duty to secure renewal contracts on

_____

[7]As Quad points out, Ms. Friedmann's testimony was read into the record at trial, but not transcribed by the court reporter, pursuant to stipulation of the parties.

behalf of Openfirst, if the jury found that Heverly and One2One were acting as agents at the time of renewal negotiations, then Openfirst could easily have prospective contracts with those clients. That is the essence of agency. Heverly's and One2One's failure to act appropriately on behalf of Openfirst does not reduce what would otherwise have been a prospective contract, if Openfirst had employed a loyal agent, to an insufficiently certain contract.[8] The defendants somewhat repetitively argue that the fact the RFPs occurred breaks the chain of causation, but that too is incorrect. As already stated, a reasonable jury could find that Bright House and Insight would not have issued RFPs, leading to Openfirst losing the contracts, without the actions taken by Heverly and One2One.

Heverly and One2One also ask for a new trial or alteration of the judgment on the entire tortious interference with prospective contract claim as to Insight, Bright House, and Pencor. The defendants seemingly rely on the above arguments as to Insight and Bright House, because they discuss only Pencor in this portion of their brief.[9] Their ultimate argument is that there is *no* evidence of a prospective contract with Insight, Bright House, or Pencor. But as already discussed, there *is* evidence of prospective contracts and interference as to Insight and Bright House, thus the defendants'

---

[8]The defendants' argument essentially asks the court to determine that an agent's act of disloyalty which de facto eliminates the certainty of a prospective contract, acts to eliminate any legal basis for a tortious interference with prospective contract claim. In other words, that disloyalty immunizes against tortious conduct. That cannot be the case.

[9]The defendants do themselves no favors here either, failing to support their assertions as to testimony regarding Pencor with any citations to the record.

assertion is unavailing because they elaborate no argument under the separate standards for granting a new trial or altering the judgment.

As to Pencor, the defendants argue that there is no evidence Openfirst discussed any renewal contract with Pencor, and that Tim Lewis ("Lewis") of Pencor specifically testified that he had no renewal discussions with Openfirst. While it seems inferentially true that Lewis had no negotiations with Openfirst, as he testified to having never heard of or spoken to Robert Kraft prior to the March 2007 phone call (Trial Tr. Vol. 5, 1057:11-1059:20) (Docket #226), the defendants do not cite to, nor can the court locate, that actual testimony. Even presuming the existence of that testimony, it does not help the defendants.

First, the original 2002 contract between Pencor and Openfirst contains an automatic renewal clause. (Trial Ex. 1008, at 1). There was ample evidence at trial from which a jury could draw the conclusion that the 2002 Pencor contract was between Pencor and Openfirst, as opposed to Heverly and what would later become One2One. (*E.g.*, Trial Tr. Vol. 5, 1076:5-1088:11, 1092:20-1094:2) (cross-examination of Tim Lewis regarding 2002 Pencor contract); (Trial Ex. 1008, at 1) ("by and between Openfirst, Communications, Inc. DBA Openfirst, Inc.…with offices at 300 North Jefferson Street, Milwaukee, WI 53202"). Tim Lewis also testified that the negotiation of the 2006 renewal contract occurred while Pencor's printing was still being performed by Openfirst in Milwaukee, under the 2002 contract. (*See* Trial Tr. Vol. 5, 1103:6-13). Finally, the 2006 renewal contract between Heverly's One2One and Pencor states that, upon taking effect, it replaces the terms of the 2002 agreement. (Trial Ex. 40, at 1). Thus, there is evidence to support finding: that Openfirst held the 2002 contract with

Case 2:09-cv-00099-JPS   Filed 06/21/12   Page 19 of 27   Document 244

Pencor; that it would automatically renew after expiration; and that Heverly and One2One—while Pencor was still operating under the 2002 contract with Openfirst— negotiated and signed a new contract with Pencor that replaced the terms of the 2002 contract with Openfirst. On the basis of that evidence, not only is Heverly and One2One's argument that there is *no* evidence of a prospective contract defeated simply by the 2002 contract's automatic renewal clause, but it would be completely unreasonable for the court to find that the tortious interference finding as to Pencor was against the weight of the evidence, or the result of a manifest error. In sum, the court sees no reason to disturb the jury's verdict regarding tortious interference with prospective contract.

### 2.2.4    New Trial on Breach of Contract, Breach of Fiduciary Duty, and Tortious Interference with Contract

Heverly and One2One next argue that the court should grant a new trial on the breach of contract, breach of fiduciary duty, and tortious interference with contract claims. Their first two arguments have been disposed of, namely that there is insufficient evidence of agency. The defendants next argue that a new trial should be granted because the damages awarded are excessive.[10]    Their reasons and conclusion are incorrect, but do illuminate a similar defect in the jury's award.

Heverly and One2One point out that Quad's damages expert, Richard Bero ("Bero"), established $415,212.00 in damages for the lost profits on existing contracts with Bright House and Pencor from March 1, 2007 (the date Openfirst and Quad terminated the relationship with the defendants), until

_____

[10]The defendants phrase it as "grossly out of proportion to the evidence," which the court takes to mean excessive.

the expiration of those contracts. (Trial Ex. 83, 84). The remaining damages offered into evidence amount to $7,321,070.00. (Trial Ex. 83, 84). The defendants claim that the $7,321,070.00 is attributable only to the tortious interference with prospective contract claim, as it is made up of only lost profits from the renewal contracts not ultimately entered into. The defendants in turn assert that the $415,212.00 is the only damages evidence applicable to the claims for breach of contract, breach of fiduciary duty, and tortious interference with existing contract. In its verdict, the jury awarded $2.5 million for breach of fiduciary duty, $2 million for tortious interference with contract, $1 million for tortious interference with prospective contract, and $2.5 million for breach of contract. Thus, the jury awarded a sum total of $8 million to Quad. Heverly and One2One are likely incorrect that lost profits from the prospective renewal contracts are not also natural and probable results of the breach of contract and breach of fiduciary duty. But the court need not decide that issue, as the aggregate award across all claims is not excessive, with one caveat.

While Heverly and One2One have not argued directly that the jury here made duplicative awards, the case law on that issue is relevant. As to the matter of duplicative damage awards, the Second Circuit concluded in one case that two equal awards of $75,000.00 on separate, but similar claims did not constitute duplicative recovery. *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153-54 (2d Cir. 1991). The *Gentile* defendants had argued that because the elements of damage caused by the two claims were identical and arose out of the same acts, the plaintiff was entitled to only one recovery and the two $75,000.00 awards were, therefore, duplicative. *Id.* at 153. Instead, the court looked to the aggregate award, compared it to the injuries suffered,

and determined that it was not excessive, and was within the jury's discretion. *Id.* In turning aside the defendants' argument, the court observed that "it is equally conceivable that the jury found that each plaintiff suffered $150,000 worth of discrete, unduplicated injuries as a result of the County's violations of law, and merely split the total amount equally between the state and federal causes of action in announcing their award to the court." *Id.* at 154. The court went on to note that merely allocating damages for a single injury under separate causes of action does not itself demonstrate that the awards are duplicative. *Id.* While the defendants have not explicitly argued the damages here are duplicative, *Gentile* remains applicable. In the end, Quad introduced evidence of damages totaling $7,727,282.00. The jury awarded an aggregate $8 million to Quad. There is no reason to suggest that the jury did not simply determine an appropriate award and then split it among the causes of action.

It does remain the case, however, that an $8 million award is excessive to the extent it exceeds the sum introduced into evidence. As such, Heverly and One2One are entitled to some form of relief. As noted earlier, a new trial may be granted where the damages are excessive. *Westchester Fire*, 183 F.3d at 582. More specifically, a court may vacate an award for excessiveness only where it is "monstrously excessive" or bears no rational connection between the evidence and verdict. *Joan W. v. City of Chi.*, 771 F.2d 1020, 1023 (7th Cir. 1985). However, rather than granting the Rule 59 motion and holding a new trial on damages, a court may also deny the motion, contingent on the prevailing party accepting a remittitur of damages. *See Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243-44 (7th Cir. 1982) (finding $172,412.00 of the damages awarded were in excess of the evidence

introduced and offering plaintiff a chance to accept remittitur in that amount, else judgment would be reversed and remanded for a new trial on damages); *see also Bonura v. Sea Land Serv., Inc.*, 505 F.2d 665, 669 (5th Cir. 1974) ("a federal district court has the power to condition the denial of a motion for a new trial upon consent to a remittitur"). The Second Circuit has explained the twin goals of remittitur as avoiding delay and the expense of a new trial where an award is intrinsically excessive, and minimizing judicial interference with an issue otherwise left to the jury. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990). Because Quad's evidence of damages was otherwise well-supported, and in fact uncontroverted other than brief cross-examination, there is no reason to suppose that the jury did not intend to award Quad the full amount of damages supported by evidence—particularly given the similarity between the actual award, and the amount introduced into evidence. Thus, the wisest course of action is to offer Quad a denial of the defendants' motion on this issue, contingent on its accepting a remittitur of $272,718.00.

### 2.2.5   New Trial for Inconsistent Verdict

Heverly and One2One next argue that the verdict itself is inconsistent and a new trial should, therefore, be granted. In general, civil jury verdicts must be consistent. *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 677 (7th Cir. 1985). Where inconsistency is not noticed until after disbanding the jury, a new trial should be held. *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998). The defendants argue that because the jury found them liable for tortious interference with contract, the jury must have concluded that Openfirst "owned" the contracts with the billing statement customers. They then argue that if such was the case, the finding of

conversion is inconsistent because such a finding would require the jury to conclude that One2One "owned" the contracts. They also briefly argue that the finding that One2One and Heverly were agents of Openfirst, and that the defendants breached a fiduciary duty to Openfirst, are also inconsistent with the finding of conversion. The defendants argue in their reply brief that if Openfirst had owed the converted monies to the defendants, the jury would have simply found a breach of contract as asked by Question No. 20 of the special verdict, yet did not. These arguments in the defendants' opening and reply briefs are at odds with each other and illustrate the defendants' kitchen-sink approach to their entire motion.

First, it is not inconsistent for the jury to have found tortious interference, agency, or breach of fiduciary duty at the same time as finding Quad liable for conversion. Even by determining that Openfirst "owned" the contracts at issue, it could easily have owed monies to the defendants under their operating agreement that were later withheld by Quad. There is no inherent inconsistency in those findings.

Second, the jury's rejection of the breach of contract claim against Openfirst is not inconsistent with a finding of conversion. The defendants ignore the fact that the jury found that *Openfirst* did not breach a contract with One2One, *nor did Openfirst convert funds* belonging to One2One. Instead, the jury found that *Quad* converted funds owed to One2One, and *was not asked* whether Quad breached a contract with One2One. That alone is sufficient to defeat the argument.

### 2.2.6    Dismissal of Punitive Damages

Finally, Heverly and One2One argue that the punitive damage awards lack sufficient evidence and should also be dismissed because of "other infirmities" and inconsistencies in the verdict.

The defendants first argue that there is insufficient evidence to support a jury's finding of the requisite intent for an award of punitive damages.  They once again argue that they were not agents of Openfirst and, presumably as a result, the evidence cannot support a finding of malicious conduct or intentional disregard of rights.   However, while detailing evidence to support their position—which is really just a re-arguing of how a jury should have interpreted the facts—they once again fail to make any citation to the record.  It is not the court's job to present a party's argument for it, and in fact this was exactly why the court required the parties to file and then cite to the trial transcript.  Heverly and One2One have failed to support this argument in any manner.

The defendants next argue that because the compensatory damages are unsupported, an award of punitive damages is unsustainable and shocking.    But, as discussed above, there is little wrong with the compensatory damages awarded, and the slight remittitur does nothing to make an additional award of punitive damages inherently excessive.

The defendants then argue that the punitive damages should be dismissed because there was no evidence as to Heverly's income or wealth, or as to One2One's financial condition.  While the defendants are correct that Wisconsin law finds evidence of wealth competent and relevant, *Dalton v. Meister*, 188 N.W.2d 494, 498-99 (Wis. 1971), they cite to no authority stating that a failure to introduce such evidence precludes an award of punitive

Case 2:09-cv-00099-JPS   Filed 06/21/12   Page 25 of 27   Document 244

damages. In fact, in Wisconsin, "[a] jury's punitive damage award will not be disturbed unless the verdict is so clearly excessive as to indicate passion and prejudice." *Jacque v. Steenberg Homes, Inc.*, 563 N.W.2d 154, 163 (Wis. 1997). Heverly and One2One provide no reason to view the jury's award as so clearly excessive as to be the product of passion and prejudice.

Finally, the defendants again appeal to the supposed inconsistency of the verdict, arguing that because a finding of conversion is inconsistent with other findings in favor of Openfirst and Quad, the finding of punitive damages in favor of both parties is similarly inconsistent. However, because the court has determined the finding of conversion is not inconsistent, neither is the verdict inconsistent because of an award of punitive damages to both Quad and the defendants.

3.      CONCLUSION

In sum, neither party has carried their burden as to granting judgment as a matter of law, granting a new trial, or altering the judgment. The only exception remains the excessive compensatory damages awarded to Quad. The court will deny Heverly's and One2One's motion contingent upon Quad accepting a remittitur of $272,718.00. If Quad chooses not to accept remittitur, the court will reconsider the motion and grant a new trial on the sole issue of compensatory damages.

Accordingly,

IT IS ORDERED that the plaintiff's Renewed Motion for Judgment as a Matter of Law and Motion to Amend Judgment (Docket #217) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendants' Motion after Verdict Pursuant to Rule 50(b) and Rule 59 (Docket #220) be and the same is hereby DENIED. This denial is partially contingent upon the plaintiff accepting a remittitur of $272,718.00 as to the total award of compensatory damages in its favor. The plaintiff should advise the court in writing within 14 days of this order whether it will accept the remittitur, after which the court will either issue an amended judgment or vacate that portion of the judgment and proceed to schedule a new trial on the issue of compensatory damages alone.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge